VKK CORPORATION, VKK Patriots, Inc. and Victor K. Kiam, II, Plaintiffs–Counter–Defendants–Appellants,

v.

NATIONAL FOOTBALL LEAGUE, B & B Holdings, Inc., The Five Smiths, Inc., Buffalo Bills, Inc., The Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns Football Co., Dallas Cowboys Football, Inc., PDB Sports Inc., The Detroit Lions, Inc., The Green Bay Packers, Inc., Houston Oilers, Inc., Indianapolis Colts, Inc., Kansas City Chiefs Football Club Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club, Inc., New York Football Giants, Inc., New York Jets Football Club, Inc., Pittsburgh Steelers Sports Inc., San Diego Chargers Football Co., Seattle Seahawks, Inc., Tampa Bay Area NFL Football, Inc., PRO Football, Inc. and Touchdown Jacksonville, Ltd., Defendants–Counter–Claimants–Appellees,

Touchdown Jacksonville, Inc., Defendant–Appellee.

Docket No. 99–7876.

United States Court of Appeals, Second Circuit.

Argued Feb. 3, 2000.

Decided March 14, 2001.

Steven R. Kuney, Williams & Connolly, Washington DC (Mark S. Levinstein, Williams & Connolly, Washington, DC, of counsel; Robert M. Heller, Kramer, Levin, Naftalis & Frankel LLP, New York, NY, of counsel), for Plaintiffs–Counter–Defendants–Appellants.

Gregg H. Levy, Covington & Burling, (Sonya D. Winner, Covington & Burling, Washington, DC, of counsel; Shepard Goldfein, Skadden, Arps, Slate, Meagher & Flom, New York, NY, of counsel), for Defendants–Counter–Claimants–Appellees.

Allen G. Reiter, Cooperman Levitt Winikoff Lester & Newman, PC, New York, NY; Terrance E. Schmidt, Bledsoe, Schmidt, Lippes, Moonly & Roberson, PA, Jacksonville, FL, for Defendant–Appellee Touchdown Jacksonville, Inc.

Steven A. Werber, Foley & Lardner, Jacksonville, FL, for Defendant–Counter–Claimant–Appellee Jacksonville Jaguars, Ltd., f/k/a Touchdown Jacksonville, Ltd.

Before: OAKES, CABRANES, and SACK, Circuit Judges.

SACK, Circuit Judge:

On November 16, 1994, plaintiff Victor K. Kiam, II ("Kiam"), and two entities through which he controlled the New England Patriots, brought suit in the United States District Court for the Southern District of New York against the National Football League (the "NFL"), twenty-two of its member clubs (with the NFL, collectively the "NFL defendants"), and two entities involved in the ultimately successful campaign to locate an NFL football team in Jacksonville, Florida—Touchdown Jacksonville, Ltd., and Touchdown Jacksonville, Inc. The plaintiffs allege that the defendants violated the Sherman Antitrust Act by preventing Kiam from moving the Patriots out of New England. The defendants assert that the plaintiffs are barred from maintaining this action because they released all claims against the defendants, including the antitrust claims, in a formal written release. Following a jury trial limited to the plaintiffs' claim of economic duress, the jury returned a verdict for the defendants. The district court then granted the defendants' motion for summary judgment with respect to the plaintiffs' remaining claims.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ We may affirm the award of summary judgment on any ground with adequate support in the record. *See Name.*

*Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 584 (2d Cir.2000); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997) ("It is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record.") Insofar as we decide this appeal in favor of the NFL defendants, we do so purely as a matter of law rather than on the basis of the jury verdict in the district court. We therefore set forth the facts in the light most favorable to the plaintiffs. *See Tenenbaum*, 193 F.3d at 593.

## BACKGROUND

The New England Patriots is a member club of the National Football League. From 1988 through 1992, Kiam, through two corporations, VKK Corporation and VKK Patriots, Inc. (Kiam and the corporations collectively "VKK"),[1] was the majority owner of the Patriots. During the period relevant to this appeal, the Patriots played their home games in Foxboro, Massachusetts. VKK alleges that when it assumed control of the Patriots, the team was experiencing substantial financial difficulties stemming in part from the inadequate facilities at Foxboro and the restrictive lease that kept the Patriots there.

As a condition precedent to the approval of his purchase of the Patriots,[2] in September of 1988, Kiam signed a contract in which VKK agreed to comply with the NFL's constitution and bylaws and to obtain advance approval from the NFL of any transfer of ownership of the Patriots. VKK further agreed to "continue to operate the Patriots' franchise within its existing home territory, unless a transfer of the franchise ... to a different city is ap-

proved by the member clubs of the League." In 1989, shortly after VKK assumed ownership of the Patriots, Paul Tagliabue, who had succeeded Rozelle as NFL Commissioner, issued a statement declaring that the sale of any club would only "become effective if approved by the affirmative vote of ... [at least] three-fourths ... of the members of the League."

The VKK-owned Patriots' first two seasons were not profitable, and Kiam was required personally to guarantee loans and use personal funds to cover the resulting cash flow shortages. In an attempt to resolve the Patriots' financial situation, Kiam unsuccessfully negotiated with Boston city officials for a new stadium. In 1990, with no prospects for a new stadium in New England, Kiam decided that it was necessary to consider moving the Patriots to another region of the country. Kiam claims that before buying the team he had received assurances from then-Commissioner Pete Rozelle that if a new stadium could not be secured in New England, such a move would be allowed.

At the time Kiam began to seek the Patriots' relocation, several cities were attempting to obtain NFL franchises. Because few new franchises were being created, groups in many of these cities sought to lure existing teams. One such group was Touchdown Jacksonville, Inc. ("TJI"), created "[t]o secure the NFL franchise for the City of Jacksonville." In the Spring of 1991, representatives of VKK and TJI held a series of meetings about the possibility of relocating the Patriots to Jacksonville.

Representatives of TJI informed the NFL of their meetings with VKK and indicated that they were close to a deal

---

1. While this opinion adheres to the convention that "Kiam" refers to the individual plaintiff and "VKK" refers to him together with the two corporations through which he owned the Patriots, the parties do not assert and we do not conclude that for purposes of the issues raised on this appeal, there is a significant distinction between "Kiam" and "VKK."

2. VKK's purchase of majority control of the Patriots included a co-ownership agreement with Francis Murray, a creditor of the Patriots' prior owner. Under this agreement, Murray eventually required Kiam to buy Murray's shares at a predetermined price.

that would bring the Patriots to Jacksonville. As to the plan, TJI told the NFL, according to testimony of the NFL Director of Planning, that "we are going to do what you tell us to do." The NFL told TJI, according to a TJI consultant involved in the negotiations, that the NFL "did not favor the move," and that if TJI wanted the support of the NFL, which TJI needed to procure a franchise, it should cease negotiations with the Patriots. As a result of the NFL comments, the consultant testified, TJI "ceased pursuing discussions with the Patriots."

Several months later, in the fall of 1991, a new Touchdown Jacksonville entity was created: Touchdown Jacksonville, Ltd. ("TJL"). The president of TJI, David Seldin, was also the president of the corporate general partner of TJL. Seldin testified that in October of 1991, TJI "transferred some of its assets to [TJL] to enable [TJL] to seek an NFL expansion franchise for the city of Jacksonville." In November 1993, the NFL awarded an expansion franchise to TJL, which then changed its name to Jacksonville Jaguars, Ltd.[3]

In 1991, Kiam informed Commissioner Tagliabue that Kiam was financially compelled to move the Patriots out of New England. Tagliabue responded that he opposed such a move and that the Patriots would not be allowed to relocate. According to Kiam's lawyer at the time, Tagliabue opposed the move because "he was, in principle, just against the concept of moving," and because he was concerned about losing the television revenues the NFL received because of "the strength of the so-called New England territory."

Meanwhile, Kiam had gone further into debt in order to meet the Patriots' expenses. He told the NFL that if he did not receive a loan he would be compelled

to relocate the team immediately. In response, the NFL increased the Patriots' debt limit by $10 million but required that VKK agree not to move the team before the end of the 1993 season. VKK asserts that even with this increased debt limit it was required to sell the team in order to raise enough cash for Kiam to meet his obligations.

Prospective purchasers of the Patriots knew that any sale of the team required approval by the NFL. VKK claims that the NFL thereby lowered the value of the franchise by limiting the pool of prospective purchasers to those interested in owning the team in New England. The NFL eventually approved the sale of the Patriots to one James Orthwein, but only after he signed an "iron clad commitment" not to move the team to his hometown of St. Louis.

In April 1992, just weeks before the sale was scheduled to close, the NFL informed Kiam and Orthwein that the League had a "release policy" under which the league would not approve a sale unless Kiam, on behalf of VKK, signed a release of all claims against the NFL, including potential antitrust claims.[4] Orthwein appeared ready to rescind the deal unless Kiam signed such a release and proceeded to closing. Kiam signed the release demanded of him (the "Release") on May 8, 1992. Three days later, on May 11, 1992, the transaction closed.

Some two and one half years later, on November 16, 1994, VKK filed the complaint in this action, asserting federal antitrust claims against the NFL, twenty-two member clubs, and TJL. The complaint alleged that the defendants violated the Sherman Act by engaging in monopolistic and conspiratorial conduct that illegally lowered the value of the Patriots and had anticompetitive effects in several markets.

---

3. We nonetheless refer to the entity as TJL throughout this opinion.

4. At least one other owner, Norman Braman of the Philadelphia Eagles, was not required

to sign a release when selling his team, apparently because, according to NFL President Neil Austrian's deposition testimony, "Norman didn't intend to move the team."

VKK attempted to avoid the effect of the terms of the Release by asserting that Kiam had signed it under economic duress, that it was itself an instrument of the anticompetitive conduct complained of under the Sherman Act and therefore void or voidable under the "part and parcel" doctrine, which holds that a release is invalid if it is an integral part of a scheme to violate the antitrust laws, and that the Release was not binding because VKK received no consideration in return. VKK also claimed that Kiam did not know that the Release had been part of a conspiracy among the defendants until the fall of 1993, a year before this suit was begun, when he read a newspaper article outlining the defendants' behavior in blocking the relocation of the Patriots to Jacksonville.

The action was originally assigned to Judge John E. Sprizzo, who stayed all merits discovery, allowing discovery to proceed only on the issues concerning the validity of the Release, pending resolution of a motion for summary judgment made by the defendants. While the motion was pending, VKK moved to amend the complaint to add TJI as a defendant, arguing that it had not realized that the entity it had negotiated with in 1991 was TJI not TJL. On April 3, 1998, Judge Sprizzo denied the motion for summary judgment and allowed the plaintiffs to amend their complaint to add TJI.

The case was then bifurcated. A jury trial was to be held on the enforceability of the Release, although it was unclear which of the plaintiffs' theories could be argued before the jury in that trial. Before the trial started, the case was reassigned to Judge Milton Pollack. Judge Pollack limited the trial to the issue of economic duress. The jury returned a verdict for the defendants.

The defendants then moved again for summary judgment on the remaining claims. On June 22, 1999, the district court granted the motion, holding that the Release was supported by valid consideration, that it was not unenforceable as

"part and parcel" of a Sherman Act violation, that the claims against TJI—a party added to the complaint after the statute of limitations had run—did not relate back to those against TJL under the requirements set forth in Fed.R.Civ.P. 15(c) and were therefore time-barred, that the Release applied to TJL, and that there were no questions of fact on the merits of the antitrust claims against the Jacksonville defendants. *See VKK Corp. v. National Football League,* 55 F.Supp.2d 196 (S.D.N.Y. 1999) ("*VKK*").

This appeal followed.

## DISCUSSION

### I. The Validity of the Release

The defendants claim that VKK was barred from bringing suit against them by the Release. VKK challenges the validity of the Release on three bases: (1) that it was signed under economic duress; (2) that it was "part and parcel" of the defendants' antitrust violation; and (3) that VKK received no consideration in exchange for it.

#### A. Economic Duress

At the heart of this appeal is the plaintiffs' assertion that the Release was invalid because it was obtained by means of the NFL's exertion of economic duress on Kiam. The jury found in favor of the NFL defendants on this issue, the only one presented to it in the first part of what was to have been the bifurcated trial.

■ *1. Applicable Law.* "[F]ederal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir. 1977); *see also Dice v. Akron, Canton & Youngstown R.R.,* 342 U.S. 359, 361–62, 72 S.Ct. 312, 96 L.Ed. 398 (1952); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993). But it does not necessarily follow from the fact that federal

law governs that we must fashion a uniform federal rule of decision. *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457 (9th Cir.1986). To the contrary, "[f]requently, state rules of decision will furnish an appropriate and convenient measure of the governing federal law." *Id.* at 1458.

The first guide the courts are required to employ in determining whether to incorporate state law or instead to create a uniform federal standard is the congressional intent underlying the federal statute involved. *See Mardan Corp.*, 804 F.2d at 1458; *Olin Corp. v. Consolidated Aluminum Corp.*, 807 F.Supp. 1133, 1140 (S.D.N.Y.1992). We cannot find any congressional directive instructing us to formulate a uniform federal standard for determining whether a release of antitrust claims is invalid on the basis of economic duress. *See* 15 U.S.C. § 1; *The Legislative History of the Federal Antitrust Laws and Related Statutes*, Vol. 1 (Earl W. Kintner, ed., Chelsea House Publishers 1978). In the absence of congressional guidance on the issue of what law to apply, we look to the three-part test enunciated by the Supreme Court in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). We assess whether: (1) the issue requires "a nationally uniform body of law"; (2) "application of state law would frustrate specific objectives of the federal programs"; and (3) "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.*

As to the first factor, while there is a federal interest in vindicating rights arising out of federal enactments, the validity of a release of antitrust claims "does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). With regard to the second factor,

the application of state law to the validity of a release will not frustrate the objectives of the antitrust laws. Although a release from a private antitrust action forecloses that action, it does not immunize the released party from liability under federal antitrust laws for its acts—government enforcement of those laws remains possible. Finally, under the third factor, a national standard for releases might interfere with the reasonable expectations of the parties to a contract. Parties expect state law to govern contracts. It is not unusual for releases, like other contracts, to state specifically that state law governs, as did the Release. Thus, application of the *Kimbell Foods* test leads us to look to New York State law, the governing law specified in the Release, to provide the content of the federal law regulating the validity of the Release.

*2. Economic Duress under New York Law.* The doctrine of economic duress arises from the theory that " 'the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.' " *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 22 (2d Cir.1974) (emphasis omitted) (quoting *Nixon v. Leitman*, 32 Misc.2d 461, 466, 224 N.Y.S.2d 448, 452 (Sup.Ct.N.Y.Co.1962)). Under New York law, "[a] contract or release, the execution of which is induced by duress, is voidable." *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983); *see also Scientific Holding Co.*, 510 F.2d at 23. However, "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." *DiRose*, 691 F.2d at 633–34; *see also Scientific Holding Co.*, 510 F.2d at 23; *International Halliwell Mines, Ltd. v. Continental Copper and Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir.1976). If the releasing party does not promptly repudiate the contract or re-

lease,[5] he will be deemed to have ratified it. A party may ratify a contract or release entered into under duress by "intentionally accepting benefits under the contract," by "remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it," or by "acting upon it, performing under it, or affirmatively acknowledging it." *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) (internal quotation marks and citation omitted).

**3. Principles of Economic Duress Applied to The Release.** The defendants tell us that we can avoid deciding the many challenges that VKK raises to the conduct of the trial, which was confined to the economic duress issue, because VKK forfeited the right to assert economic duress. As noted, under the applicable law, VKK was required to repudiate the Release promptly in order to assert such duress. *DiRose*, 691 F.2d at 633–34. The burden on a party seeking to avoid contractual obligations on the grounds of economic duress "increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question, since it is well established under New York law that a party asserting duress must do so promptly." *International Halliwell Mines, Ltd.*, 544 F.2d at 108. Delays as short as six months have been held to constitute forfeiture of the claim. *See DiRose*, 691 F.2d at 634 (collecting cases in which delays ranging from six months to two years constituted forfeiture). Here, VKK waited thirty months before challenging the release. As a matter of law, the defendants argue, VKK forfeited any right it may have had to assert duress. We agree.

Our cases and the New York cases dealing with duress are typically not about duress caused by conspiracy but about a corporate or commercial deal gone sour. *See, e.g., DiRose; International Halliwell Mines; Scientific Holding Co.; Joseph F.*

*Egan, Inc. v. City of New York*, 17 N.Y.2d 90, 268 N.Y.S.2d 301, 215 N.E.2d 490 (1966); *Leader v. Dinkler Mgmnt. Corp.*, 26 A.D.2d 683, 272 N.Y.S.2d 397 (2d Dep't 1966), *aff'd*, 20 N.Y.2d 393, 283 N.Y.S.2d 281, 230 N.E.2d 120 (1967); *Powell v. Oman Constr. Co.*, 25 A.D.2d 566, 267 N.Y.S.2d 862 (2d Dep't 1966); *Feyh v. Brandtjen & Kluge, Inc.*, 1 A.D.2d 1014, 151 N.Y.S.2d 454 (2d Dep't 1956), *aff'd*, 3 N.Y.2d 971, 169 N.Y.S.2d 38, 146 N.E.2d 794 (1957); *Port Chester Elec. Constr. Corp. v. Hastings Terraces, Inc.*, 284 A.D. 966, 967, 134 N.Y.S.2d 656, 658 (2d Dep't 1954). Not infrequently, when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other. The weaker party often must enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two.

Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases. Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the contract or release challenged long after the instrument became effective. The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release, the rights and duties under it become free of the doubt engendered by possible assertions of duress. And, importantly for the case at bar, the

---

5. We use the *DiRose* phrase "contract or release" understanding, of course, that there is no real dichotomy: A release is ordinarily either part of a contract or itself a contract.

124

requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced. He will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect.

We are not altogether in disagreement with VKK's assertion that despite these general principles, the time after which VKK was required to act promptly in order effectively to disclaim the Release began to run not at the time of its execution, but when Kiam learned of the conspiracy about which he and the two VKK companies complain. Not until then could they lay his economic duress at the door of the defendants and seek to renounce the Release in order to pursue their antitrust claims against the defendants. As in the case of fraud, where the time for the defrauded party to bring an action begins to run when the fraudulent acts are or reasonably should have been discovered, *see* *Corcoran v. New York Power Auth.*, 202 F.3d 530, 541 (2d Cir.1999); *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 349–50 (2d Cir.1993); N.Y.C.P.L.R. 213(8), 203(g), the time for VKK to disclaim the Release began when the conspiracy of which VKK complains was or reasonably should have been uncovered.[6] That, VKK says, occurred in the Autumn of 1993. Kiam knew that VKK's inability to relocate the Patriots was at the heart of his financial difficulties. But not until Kiam learned about "the [1991] conduct of the NFL and the Jacksonville group in blocking [the team's] relocation," Appellants' Br. at 16, did Kiam know it was the conspiracy of which VKK now complains that resulted in VKK's having to sell the club and deliver the Release.

While we do not reject VKK's theory, neither do we find it applicable to the facts of this case.

First, this suit was not begun until November *1994*, roughly a year after the date Kiam says he learned about the TJI/NFL exchange. VKK asserts that it "filed this action as soon as [it] could mobilize the necessary legal resources." Appellants' Br. at 16. Even accepting this assertion, one year seems to be simply too long a period after Kiam's asserted discovery of the conspiracy that caused the duress to have waited to disclaim the Release.

Second, even if one year were not too long a period after discovery to disclaim, the undisputed facts make plain that Kiam had sufficient knowledge of the conspiracy as a whole at the time he executed the Release to permit VKK to renounce the Release promptly after Kiam signed it. Among other things, at that time, Kiam knew from a letter sent to him by the NFL that he had agreed to "continue to operate the Patriots' franchise within its existing home territory, unless a transfer of the franchise . . . to a different city is approved by the member clubs of the League." He knew that the NFL—an agglomeration of entities previously held to have unlawfully conspired among themselves, *see North Am. Soccer League v. Nat'l Football League,* 670 F.2d 1249, 1257–59 (2d Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *see also Los Angeles Mem'l Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1387–90 (9th Cir.1984)—stopped him from relocating the Patriots. He knew or should have known that the fact that they had stopped him from relocating had caused him to sell the team at a depressed price. He knew that NFL offi-

**6.** By way of hypothetical illustration: As the result of a secret plan between Companies A and B, it is impossible for the fledgling business of Company C to succeed in competition with Companies A and B. Company A buys failing Company C at distress prices, obtaining a general release from Company C's owner, including a release of all antitrust claims, as part of the deal. Company C's owner learns of the conspiracy thirty months later and promptly files suit. Because Company C disclaimed the release promptly after learning of the conspiracy, it arguably preserved its right to avoid the release on a duress basis enabling it to bring an antitrust action against Companies A and B.

cials would not permit the owners to approve Orthwein's purchase without his written agreement not to attempt to relocate the team. Kiam knew that the NFL had refused to compromise on obtaining a release from him of all antitrust claims relating to relocation before his sale of the team could close. He knew that the terms of the Release provided an additional incentive, if more incentive were necessary, for the NFL to continue to deny relocation of the Patriots in Orthwein's hands. He knew that "NFL officials required [ ] Orthwein to sign a commitment not to sue the NFL if he were prevented from moving—which the NFL trumpeted as an 'ironclad commitment' that he would not move." Appellants' Br. at 14. (emphasis omitted). According to Sam Jankovich, Chief Executive Officer of the Patriots, Kiam even knew that a TJI official had explained to Jankovich that "the NFL had told [TJI] to cease all discussion with the Patriots about relocating the Patriots to Jacksonville and that if [TJI] continued to pursue negotiations with the Patriots, the Patriots would not be permitted to relocate and [TJI's] chances of securing an NFL expansion team would be hurt." And according to Jankovich, Kiam also knew that this TJI official had told Jankovich that "as a result of the NFL's communication, [TJI] was withdrawing its offer and would not participate in any further discussions with the Patriots."

We find it particularly telling that when, in 1994, VKK finally pled the conspiracy in a fourteen-paragraph section of its complaint entitled "The Defendants' Conspiracy to Prevent All Relocations By NFL Teams Out of Their Home Territories," it did not so much as mention the interactions between TJI and the NFL, knowledge of which it now contends was necessary for Kiam to discover the conspiracy, disclaim the Release, and cause this lawsuit to be initiated.

Since Kiam knew both the extent of the economic duress under which he signed the Release and the essential components of the conspiracy that he says gave rise to that duress at the time he executed the Release, VKK was required to challenge its validity promptly after that execution, or not at all. We hold that as a matter of law, thirty months was not "prompt." We therefore affirm that part of the district court's judgment that was based on the jury verdict in this regard, albeit on grounds different from those upon which the district court relied and without considering that verdict or its propriety.

## B. "Part and Parcel" Doctrine

VKK mounts a second challenge to the validity of the Release under the "part and parcel" doctrine. Rarely discussed and more rarely applied, "part and parcel's" roots are traced to Justice Cardozo's statement in *Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462, 56 S.Ct. 297, 80 L.Ed. 327 (1935), that a release to an antitrust claim may be invalid "when it is so much a part of an illegal transaction as to be void in its inception."[7] The doctrine holds that a release is invalid if "the release itself was an integral part of a scheme to violate the antitrust laws." *Redel's Inc. v. General Elec. Co.*, 498 F.2d 95, 100–01 (5th Cir.1974); *see also Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1315 (5th Cir.1983); *Dobbins v. Kawasaki Motors Corp.*, 362 F.Supp. 54, 58 (D.Or.1973). The release must be "an object of the combination or conspiracy" or "an integral part of the scheme in restraint of trade." *Dobbins*, 362 F.Supp. at 58. "[I]f the release is merely an outgrowth, rather than a cause of the violation," it is not part and parcel of the antitrust conspiracy. *Northern Oil Co., Inc. v. Standard Oil Co.*, 761 F.2d 699, 706 (Temp.Emer.Ct.App.1985) (Metzner, J.).

---

**7.** The doctrine may have descended also from the more ancient maxim that "[i]f [a] contract [is] in restraint of trade it [is] void because in violation of the Sherman Anti–Trust Law."

*United States v. Delaware, Lackawanna & W.R.R. Co.*, 238 U.S. 516, 531, 35 S.Ct. 873, 59 L.Ed. 1438 (1915).

No United States Court of Appeals has ever applied the part and parcel theory to invalidate a release. Indeed, at least one circuit has expressed grave doubt as to the very existence of the doctrine. *See Taxin v. Food Fair Stores, Inc.*, 287 F.2d 448, 451 (3d Cir.1961) ("[W]e are not able to imagine any meaningful way in which the obtaining of a release could be, in appellants' own words, 'part of and in furtherance of the continuing conspiracy among the defendants about which plaintiffs complain.' ") We see no reason, however, to decide for this Circuit whether the doctrine is viable. If it is, it does not apply in this case.

The conspiracy of which VKK complains is the NFL defendants' scheme to prevent franchise relocation. But insofar as VKK is concerned, the conspiracy was complete when it agreed to sell the Patriots to Orthwein because VKK could not move the team. The Release therefore was not part and parcel of the alleged conspiracy insofar as VKK was a victim of it. It only stopped VKK from bringing suit to recover treble damages for its alleged victimization.

VKK proffers two theories as to why the Release was nonetheless an integral part of the NFL defendants' conspiracy: First, "[i]f Mr. Kiam could sue and establish that the NFL's efforts to keep him in New England violated the antitrust laws, then the NFL defendants could not keep any subsequent owner hostage in New England." Appellants' Br. at 26. Second, "the terms of the [R]elease document itself . . . [exposed] the member clubs to liability if they allowed Mr. Orthwein to move." *Id.*

We think that those asserted consequences of Kiam's signing of the Release are insufficient to render the Release an integral part of the alleged conspiracy. As to the first, there was nothing to prevent VKK from bringing an action under the antitrust laws against the defendants in 1991, while it was actually being prevented by the NFL from relocating and before Kiam signed the Release. There is similarly nothing to prevent another member club denied the ability to relocate to begin litigation post-Release to challenge the NFL's behavior. While the Release might have been useful to the alleged conspirators in fending off such a challenge from VKK, the alleged conspiracy could plainly have proceeded without it. It was therefore not an integral part of a scheme to violate the antitrust laws.

VKK's argument also proves too much. It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution. Such a release would seem always to protect the ongoing conspiracy because it always prevents the releasor from beginning litigation that would establish the scheme's illegality. We do not think that the part and parcel doctrine can be read so broadly as thus to render void all releases relating to conspiracies alleged to continue post-release.

The second basis for VKK's argument fares worse than the first. VKK asserts:

At an April 1, 1992 meeting, before allowing the owners to vote on [Orthwein's] purchase of the Patriots, NFL officials required [ ] Orthwein to sign a commitment not to sue the NFL if he were prevented from moving—which the NFL trumpeted as an "ironclad commitment" that he would not move.

Appellants' Br. at 14. (emphasis omitted) In light of this "ironclad commitment," allegedly obtained as part of the NFL's illegal conspiracy to prevent franchise relocation, the fact that the Release also "[exposed] the member clubs to liability if they allowed Mr. Orthwein to move," *id.* at 26,[8]

8. The Release excepted from its coverage "claims, other than claims under federal or state antitrust laws (which are hereby re-

leased), arising out of a League decision to approve a relocation of the ... [Patriots] ... NFL franchise or playing site to a location

though arguably of some benefit to the NFL, hardly made the Release an integral part of the scheme. Orthwein could not move the team in any event.

We conclude, therefore, that whatever the status of the part and parcel doctrine, the Release was not invalid under it because it was not an integral part of the NFL defendants' alleged conspiracy.[9]

### C. Absence of Consideration

VKK asserts, finally, that the Release fails for want of consideration. Citing *Maynard v. Durham & S. Ry. Co.*, 365 U.S. 160, 163, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961), VKK contends that federal law applies, and that under federal law, consideration is required to render a release enforceable. VKK alleges that all it received in return for the Release was permission to sell the Patriots, a right the NFL owners had already granted by approving the sale. In reply, the defendants argue (1) that under New York law, which governs because the Release contains a New York choice of law clause, a written release is valid even in the absence of consideration; and (2) that even if federal law applies, there was adequate consideration for the Release because VKK was allowed to sell the Patriots and received substantial consideration for doing so. The defendants do not dispute that consideration is required under federal law.

We agree with the district court that we need not resolve the question of which law is applicable. If New York law applies, the release is valid under N.Y. Gen. Oblig. Law § 15–303, which provides that "[a] written instrument which purports to be a total or partial release of all claims . . . shall not be invalid because of

the absence of consideration or of a seal." And under federal law, as the district court observed, the plaintiffs received "valuable consideration" because, "[i]n exchange for executing the Release, [VKK] received the NFL's consent to transfer ownership of the Patriots." *VKK*, 55 F.Supp.2d at 208; *see also Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1261 (4th Cir.1991) (consent to franchise transfer was adequate consideration for release). VKK's argument that the sale had already been approved by the NFL and that the Release is not binding because of the lack of consideration given in return therefore fails.

### II. Whether TJI was a Properly Added Party

While we thus agree that the action against the NFL defendants was properly dismissed, we conclude that the district court erred in granting summary judgment to TJI and TJL.

### A. Relation Back of the Complaint.

The district court decided that VKK's amended complaint, which added TJI as a defendant, did not relate back to the filing of the initial complaint and that the claims against TJI were thus time-barred. *VKK Corp. v. Nat'l Football League*, 187 F.R.D. 498 (S.D.N.Y.1999). We review for abuse of discretion a district court's determination that an amended complaint does not relate back to the original complaint. *See Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir.1989); *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir.1988).

---

outside of New England prior to January 1, 1995." VKK's argument appears to be that this provision put pressure on the member clubs not to permit such relocation.

9. The district court dismissed VKK's part and parcel claim on the ground that the jury's failure to find economic duress precluded a part and parcel argument. *See VKK*, 55

F.Supp.2d at 206–08. The district court confused the two doctrines by combining them. We find nothing about the theory of the part and parcel principle that would require the Release to be "obtained through coercion or duress" in order to be held invalid, *id.*, so long as the Release were indeed integral to the conspiracy being challenged.

■ If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it "relates back" to a timely filed complaint. *See* Fed.R.Civ.P. 15(c). The goal of relation-back principles is "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir.1997) (quoting Fed.R.Civ.P. 15 Advisory Committee Note (1991)) (internal quotation marks omitted). Rule 15(c) of the Federal Rules of Civil Procedure describes the requirements necessary for an amended complaint to relate back to an original complaint:

> An amendment of a pleading relates back to the date of the original pleading when
>
> . . . .
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within [120 days of filing the complaint], the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

■ There are thus three requirements that must be met before an amended complaint that names a new party can be deemed to relate back to the original timely complaint. First, both complaints must arise out of the same conduct, transaction, or occurrence. Second, the additional defendant must have been omitted from the original complaint by mistake. Third, the additional defendant must not be prejudiced by the delay. *See Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35–36 (2d Cir.1996). VKK's amended complaint meets all three requirements.

First, both the original and the amended complaints arise out of the same conduct: the alleged agreement between TJI and the NFL defendants pursuant to which TJI discontinued negotiations with VKK for relocation of the Patriots to Jacksonville.

Second, TJI was omitted from the original complaint because of a "mistake concerning the identity of the proper party." Fed.R.Civ.P. 15(c)(3)(B). The district court concluded that TJI was strategically omitted and TJL was sued because it was the recipient of the "payback" franchise. *VKK Corp.,* 187 F.R.D. at 499. But in its original complaint, VKK describes its interactions in the spring of 1991 with an entity that it calls "Touchdown Jacksonville, Ltd." At that time, however, TJI was the only Touchdown Jacksonville entity extant, and TJI was concededly the entity whose actions are described in the complaint. TJL was not created until the fall of 1991. We see no plausible reason for VKK purposefully to claim negotiations with and ascribe actions to a company that did not exist. We have found nothing in the extensive record on appeal to support the district court's theory as to VKK's strategy.

Third, the amended complaint also meets the "no prejudice" requirement. TJI "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against" it. Fed.R.Civ.P. 15(c)(3)(B). TJI and TJL had an ongoing relationship. Both were created to accomplish the same goal—bringing an NFL football franchise to Jacksonville, Florida—and in October 1991, TJI transferred some its assets to TJL in order to help accomplish that goal. The president of

TJI, David Seldin, was also the president of TJL's corporate general partner. Seldin admitted that he read the original complaint when it was first filed in November 1994 and thus should have known that some of the allegations therein were meant to be directed at TJI. *See Advanced Magnetics Inc.*, 106 F.3d at 19 (holding that " '[t]he substitution of . . . parties after the applicable statute of limitations may have run is not significant when the change is merely formal and in no way alters the known facts and issues on which the action is based.' ") (quoting *Staren v. American Nat'l Bank & Trust Co.*, 529 F.2d 1257, 1263 (7th Cir.1976)); *Peterson v. Sealed Air Corp.*, 902 F.2d 1232, 1237 (7th Cir. 1990) (finding that a corporation might receive notice within the meaning of Rule 15(c) if "its president reads about the suit in *The Wall Street Journal* and recognizes that his firm is the right defendant" and that "[a] complaint naming GM that went on and on about the plaintiff's Thunderbird would alert Ford's agent that Ford was the right party."); *William H. McGee & Co. v. M/V Ming Plenty*, 164 F.R.D. 601, 606 (S.D.N.Y.1995) (holding that "[t]he misidentification of similarly named or related companies is the classic case for application of Rule 15(c) relation back."). Seldin must have recognized that paragraphs 60 and 61 of the complaint did not mean to refer to TJL because, as he testified, TJL "did not even exist in April 1991."

Because the amended complaint squarely meets all three requirements of Rule 15(c), we hold that the district court abused its discretion in deciding that it did not relate back to the original complaint,

and that the claims against TJI were therefore time-barred.

## B. Coverage of the Jacksonville Defendants by the Release

The claims against TJI and TJL cannot be dismissed based on the Release because the Release does not cover TJI or TJL. The district court concluded that the Release unambiguously included TJL and therefore granted TJL summary judgment. *VKK*, 55 F.Supp.2d at 209–10. We disagree.

■ Under New York law,[10] "the initial interpretation of a contract 'is a matter of law for the court to decide.' " *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996)). Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous. *See Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990); *Garza v. Marine Trans. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988). "[I]f the contract is capable of only one reasonable interpretation, *i.e.*, is unambiguous, we are required to give effect to the contract as written." *K. Bell & Assoc.*, 97 F.3d at 637 (internal quotation marks omitted); *see also Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir.1996); *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 107 (2d Cir.1993).

The district court concluded that the "plain, unambiguous language of the Release confirms that . . . [TJL] is within its scope" because TJL is a member club of

---

**10.** Although VKK is a Delaware Corporation and the defendants are from multiple jurisdictions within the United States, the Release contains a New York choice of law clause, the events around which the suit revolves occurred in New York, New York is the forum state, and the parties proceeded in the district court and before us on the assumption that New York law applies. We see no reason for us not to apply the law of New York. *Cf. Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163,

175 (2d Cir.2000) ("No reason of policy warrants a departure from [the parties'] implied choice-of-law" during jury trial); *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 n. 5 (2d Cir.1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

the NFL and a successor "to the NFL and/or to the 28 predecessor member clubs." *VKK,* 55 F.Supp.2d at 209–10. The district court also found "that the Release was intended to cover all member clubs of the NFL, including member clubs at the time any 'future ... claims' might be brought by the plaintiffs." *VKK,* 55 F.Supp.2d at 209. We disagree.

■ The Release states that Kiam and the two VKK corporations:

> hereby release and forever discharge the National Football League, its officers, directors, ... employees, subsidiaries, affiliates, partners, predecessors, principals, heirs, executors, administrators, trustees, beneficiaries, agents, successors, and assigns, and each Member Club of the National Football League ... their officers, directors ... subsidiaries, affiliates, partners, predecessors, principals, heirs, executors, administrators, trustees, beneficiaries, agents, successors, and assigns ... of and from any and all past or present or, if based, in whole or in part, on facts, actions, claims or matters existing or occurring from the beginning of the world to the date of this Release, future claims.

The Release does not say that Kiam and the two VKK corporations release clubs that are not members at the time the Release is signed but become members at the time future claims are brought. There are two words that might be interpreted to include future member clubs: "successor" and "affiliate." A "successor" is generally defined as "one that succeeds or follows; one who takes the place that another has left and sustains the like part or character." Black's Law Dictionary, 1446 (7th ed.1999). TJL is neither a successor of the NFL nor a successor of a member club. It did not take the place of any entity that existed at the time of the sign-

ing of the Release. Rather, it is a completely new member club added to the NFL in 1994.[11] An "affiliate" is defined as "being close in connection, allied, associated, or attached as a member or branch." *Id.* at 59. The Release's reference to "affiliates" and the definition of the word are stated in the present tense. Nothing in this definition indicates the inclusion of future rather than present members.

Our conclusion that the Release does not cover future member clubs such as TJL is supported by the principle of *expressio unius est exclusio alterius.*[12] The NFL and its member clubs are sophisticated commercial actors who could have specifically referred to future member clubs had they intended to include them in the Release. The Release refers to "past, present, and future ... Releasors" but makes no mention of future "Releasees," leading us to conclude that the parties to the Release did not intend to include future member clubs. *See Cornell Univ. v. UAW Local 2300,* 942 F.2d 138, 139 (2d Cir.1991) (holding that under the theory of *expressio unius est exclusio alterius,* a collective bargaining agreement that enumerates those matters subject to arbitration excludes those matters not enumerated); *Israel Discount Bank, Ltd. v. Gottesman,* 544 F.2d 80, 82 (2d Cir.1976) (applying the maxim *expressio unius est exclusio alterius* to find that "the failure of Israel Discount, a sophisticated commercial lender, to include ... specific reference to tort claims precludes our divining or implying such a right on the basis of the general language of the agreement.") The Release therefore does not cover TJL, and the district court improperly granted summary judgment on that basis.

Finally, TJI has never been a member or affiliate of the NFL or a successor or affiliate of a member club. Whether or

---

**11.** The Release thereby creates a concededly odd result. Had Touchdown Jacksonville been given an existing NFL team, it would then be a successor to a member club and covered by the Release.

**12.** "[T]o express or include one thing implies the exclusion of the other, or of the alternative." Black's Law Dictionary, 602 (7th ed.1999)

not future members are included within the Release, TJI is not covered.

### III. The Antitrust Claims

 Section 1 of the Sherman Antitrust Act makes it unlawful to enter into a conspiracy in restraint of trade. 15 U.S.C. § 1. While some restraints of trade are illegal per se, others, such as trade restrictions by sports leagues, are analyzed to determine whether the restriction's "harm to competition outweighs any procompetitive effects." *St. Louis Convention & Visitors Comm'n v. Nat'l Football League,* 154 F.3d 851, 861 (8th Cir.1998); *Los Angeles Mem'l Coliseum Comm'n,* 726 F.2d at 1391. In order to prevail under section 1, a plaintiff must show that: "(1) there was an agreement among ... [the defendants] in restraint of trade; (2) [the plaintiff was] injured as a direct and proximate result; and (3) its damages are capable of ascertainment and not speculative." *St. Louis Convention & Visitors Comm'n,* 154 F.3d at 861.

 The district court, as an alternative ground for granting summary judgment to TJL and TJI, concluded that there was no evidence of a conspiracy among the NFL, TJI, and TJL defendants. *VKK,* 55 F.Supp.2d at 210–11. We hold that that was an issue of fact that could not be resolved by means of summary judgment on the current record.

VKK presented "direct or circumstantial evidence that reasonably tends to prove that [TJI and TJL] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987) (internal quotation marks omitted). It is undisputed that representatives of TJI were negotiating with the Patriots in the Spring of 1991, that they called the NFL for "guidance," and that they promised the NFL, "We are going to do what you tell us to do." Mr. Braman, the former owner of the Philadelphia Eagles, testified that the NFL's president "had told the various cities [competing for expansion teams] that if they spoke to Mr. Kiam, they would be removed from the expansion process." Jacksonville was such a city competing for an expansion team, and representatives of the entity leading the quest quickly broke off negotiations with VKK. A rational trier of fact could conclude that TJI was involved in a conspiracy with the NFL to thwart the Patriots' relocation. As for TJL, the district court does not mention the possibility that it could be held liable as a successor to TJI, despite the fact that the two entities had common management and that immediately after TJL was formed it engaged in a "transaction" with TJI through a "general conveyance" that involved a division of assets and liabilities.

 Where an "inference of conspiracy is reasonable in light of the competing inferences of independent action," *Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88, 106 S.Ct. 1348, it is up to the jury to weigh those competing inferences. *Apex Oil Co.,* 822 F.2d at 253. Because on the basis of the record thus far accumulated a genuine issue of material fact exists as to the existence of a conspiracy, the district court erred in granting summary judgment to TJI and TJL on the substantive antitrust claims. We stress, however, that in light of the state of the proceedings at the time of the judgment appealed to us, we do not rule out the possibility that the action against the remaining defendants may be disposed of short of trial at some point following remand.

### CONCLUSION

We therefore affirm the judgment of the district court with respect to VKK's claims against the NFL defendants but vacate and remand the judgment with respect to VKK's claims against TJI and TJL for further proceedings not inconsistent with this opinion. While we understand that

this leaves the NFL dog of this litigation quite dead but the TJI/TJL tail still wagging, the result is a necessary outgrowth of the fact that at this point, only the validity and operation of the Release have been fully litigated. The Release protects the NFL defendants but not TJI or TJL.