*249 Rivera, J.
(dissenting). I disagree with the majority that respondent EMI has carried its burden on this motion to dismiss because, in my opinion, the term “affiliate” as used in the Agreement may be interpreted as appellant suggests to include EMI’s foreign affiliated entities. This reasonable interpretation of the Agreement supports a conclusion that appellant has sufficiently pleaded a cause of action for breach of contract. To hold otherwise, as the majority does here, forecloses appellant from pursuing his claim that EMI has avoided its obligations under the Agreement by employing music industry business models that increase revenue for publishers, to the detriment of creative artists. Therefore, I dissent.
Our review of this appeal, which is from dismissal of the complaint pursuant to CPLR 3211 (a) (1) and (7), requires that we “must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory” (Whitebox Concentrated Convertible Arbitrage Partners, L.P. v Superior Well Servs., Inc., 20 NY3d 59, 63 [2012]). “[T]he pleading is to be afforded a liberal construction” (Leon v Martinez, 84 NY2d 83, 87 [1994]; Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314 [2002]; see CPLR 3026), and “[u]nder CPLR 3211 (a) (1), a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law” (Leon v Martinez, 84 NY2d 83, 87-88 [1994], citing Heaney v Purdy, 29 NY2d 157 [1971]). Unlike on a motion for summary judgment where the court “searches the record and assesses the sufficiency of the parties’ evidence,” on a motion to dismiss the court “merely examines the adequacy of the pleadings” (State of New York v Barclays Bank of N.Y., 151 AD2d 19, 21 [3d Dept 1989], affd 76 NY2d 533 [1990]).
The Court has previously faced questions regarding the application of existing legal doctrines to agreements which predated industry-wide developments, and has reaffirmed the vitality of traditional contract precepts in the face of even unanticipated changes. For example, in Greenfield v Philles Records we said that, “[d] espite the technological innovations that continue to revolutionize the recording industry, long-settled common-law contract rules still govern the interpretation of agreements between artists and their record producers” (98 NY2d 562, 569 [2002]).
*250 Under our law, where the parties to a breach of contract action dispute the intended meaning of the agreement, we look to the contract itself to determine if the terms are unambiguous, giving the words of the contract their “plain meaning” (Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 559-560 [2014] [“a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms” (citations omitted)]). If the terms are ambiguous, dismissal of the complaint under CPLR 3211 must be denied (see Telerep, LLC v U.S. Intl. Media, LLC, 74 AD3d 401, 402 [1st Dept 2010]). Ambiguity exists when, looking within the four corners of the document, the terms are reasonably susceptible of more than one interpretation (see Greenfield, 98 NY2d at 569; Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986]).
Applying these contract principles to this Agreement, and reading the complaint liberally, as the Court is required to do, I would conclude that the Agreement contains unclear and contradictory language which renders the term “affiliate” ambiguous. I would therefore reverse the Appellate Division.
At the heart of the parties’ dispute is the intent of the Agreement’s foreign publication royalties provision. Respondent EMI argues that under this provision the parties share the net revenues actually received, meaning the revenues that EMI receives after the costs and fees for foreign publication are deducted. Appellant agrees, but claims that EMI has sought to garner a greater share of the revenues by using its own affiliates, rather than unaffiliated entities, to conduct the foreign publication process. This, appellant maintains, is in direct contravention of the intent of the parties because at the time the parties entered the Agreement they intended to share the costs and fees charged only by unaffiliated entities.
Appellant argues, and EMI concedes, that there have been changes in the manner in which publishers pursue foreign publication of creative works such as those involved in this case. According to appellant, over time the music publishers began to use their own affiliates for foreign publication. By so doing, the music publishers, including EMI, captured a greater share of the revenue for themselves by claiming net revenues as well as the fees formerly charged by the unaffiliated foreign entities. (See also Ira B. Selsky, Music Publishing in the International Marketplace, 17 Whittier L Rev 293, 298 [1995].) Appellant claims EMI’s share comes at a cost to the Ellington family *251 members and their successors because EMI does not include as part of the “net revenue actually received” the revenue EMI’s foreign affiliates are paid for foreign publication.
Respondent EMI contends that the only affiliates referred to in the Agreement are those of EMI’s predecessor, Mills Music, Inc., which, according to EMI, cannot include foreign subpublishers. This merely begs the question of what is an affiliate. I find the failure to define affiliate in this Agreement indicates that the meaning is not as obvious and clear as EMI suggests, and very well supports appellant’s argument that affiliate includes foreign affiliates.
As a general matter, an “affiliate” is defined as a “corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation” (Black’s Law Dictionary [9th ed 2009]; see also VKK Corp. v National Football League, 244 F3d 114, 130 [2d Cir 2001] [defining “affiliate” as “being close in connection, allied, associated, or attached as a member or branch”]). Nothing in this common definition suggests that an affiliate does not include a foreign affiliate. Courts may not redefine a term to suit one party’s argument, or choose to ignore the meaning generally attached to a term without some basis in the parties’ agreement. Therefore, there is an open question that cannot be answered on this motion to dismiss as to whether the parties intended to include foreign affiliates.
Respondent EMI argues, nevertheless, that, in context, the Agreement’s references make clear that foreign affiliates are excluded from that term’s coverage. I cannot find such absolute clarity in the text of the Agreement. For example, although EMI asserts that the only affiliates are those of Mills Music, the Agreement does not appear to be so limited. For example, the second “Whereas” clause refers to “the Second Party or any of its affiliated companies.” If, as EMI claims, the only affiliates covered by the Agreement are those of Mills Music, there is no need to reference affiliated companies of the Second Party, which consists of several other music publishers in addition to Mills Music. Perhaps this reference is merely redundant or superfluous; or perhaps it refers to affiliates of the other companies listed in the Preamble as “Second Party” entities.
In response to appellant’s contention that EMI uses foreign subpublisher affiliates to avoid its obligations under the contract and reduce the revenues due to appellant, EMI claims that the *252 Agreement includes only affiliates in existence at the time of the formation of the contract. However, the purpose of the Agreement, as well as the custom in the music industry, supports appellant’s interpretation.
Under the Agreement, Ellington family members transferred to the music publishers their interests in certain of Duke Ellington’s creative works; works which at the time, and today, are undeniably of great creative and monetary value. In return, the music publishers agreed to provide royalties from various sales of these works, including revenues from foreign publication. Appellant argues that Duke Ellington and his family did not intend to enter an Agreement which promised them royalties, but permitted the music publishers, through corporate sleight of hand, to increase the publishers’ revenues while reducing the Ellingtons’ royalties.
Appellant further asserts, and EMI does not dispute, that at the time the parties entered the Agreement Mills Music followed the general industry practice of using foreign unaffiliated subpublishers for foreign publication. The existence of this music industry custom, understood by the parties to be the operative business model and the way things were done, supports appellant’s claim that all the parties to the Agreement understood that foreign subpublishers would be used, and their fees would be discounted from the revenue. “When trade usage is widespread, there is a presumption that the parties intended its incorporation by implication, unless the contract negates this implication” (see Jobim v Songs of Universal, Inc., 732 F Supp 2d 407, 417 [SD NY 2010], citing Contract Law § 9:25 [28 West’s NY Prac Series]).
Respondent EMI argues that nothing in the contract prohibits it from modifying its practices and adapting to industry changes. It contends that appellant is in reality arguing to reform the Agreement from a net revenue contract to an at source contract. This argument is simply an attempt to distract attention from the real issue in the case. Appellant does not dispute that the foreign publication provision applies a net receipt methodology for determining royalties. Rather, he argues that EMI has manipulated the agreed-to net receipt provision to exclude revenues EMI actually receives through its foreign affiliate. The Agreement lends itself to more than one interpretation concerning the net revenue sharing provision, and appellant’s interpretation seems reasonable, or at least as reasonable as the one proposed by EMI.
*253 As a final note, appellant’s claims should give us pause because they suggest this is not, as the majority seems to believe, the unintended results of “the globalization of the music industry” that renders the Agreement “more favorable to music publishers than to artists” (majority op at 247 [footnote omitted]). Indeed, I share the concurring opinion’s sense that there is something troubling about interpreting “affiliate” in the context of this Agreement, as the majority does, to include only those affiliates in existence at the formation of the contract (concurring op at 248). This interpretation sets the stage for the type of abuse alleged here, namely corporate reconfigurations that avoid the understanding of the parties.
Judges Graffeo, Read and Pigott concur; Judge Smith concurs in result in an opinion; Judge Rivera dissents and votes to reverse in an opinion in which Chief Judge Lippman concurs.
Order affirmed, with costs.