**In re WORLDCOM, INC. SECURITIES LITIGATION**

**State of Alaska Dept. of Revenue and Alaska State Pension Investment Board, Plaintiffs,**

**v.**

**Bernard J. Ebbers, John W. Sidgmore, Scott D. Sullivan, Clifford Alexander, Jr., James C. Allen, Judith Areen, Carl H. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett Jr., Gordon S. Macklin, John A. Porter, Bert C. Roberts Jr., Lawrence C. Tucker, Juan Villalonga, Citigroup, Inc., Salomon Smith Barney Inc., J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Bank of America Corp., Banc of America Securities LLC, ABN Amro Inc., Deutsche Bank AG, Deutsche Bank Alex. Brown Inc., Lehman Brothers Holdings Inc., Lehman Brothers Inc., Credit Suisse Group, Credit Suisse First Boston Corp., Goldman Sachs Group Inc., Goldman Sachs & Co., UBS Warburg LLC, Nationsbanc Montgomery Securities LLC, Utendahl Capital Partners L.P., Blaylock & Partners L.P., Tokyo–Mit-**

subishi International PLC, West-deutsche Landesbank Girozentrale, BNP Paribas Securities Corp., Caboto Holding Sim S.p.A., Caboto–Gruppo Intesabei, Robertson Stephens International Limited, Mizuho International PLC, Fleet Securities Inc. and Arthur Andersen LLP, Defendants.

Nos. 02 Civ. 3288(DLC), 03 Civ. 6592.

United States District Court,
S.D. New York.

Nov. 21, 2003.

Max W. Berger, John P. Coffey, Steven B. Singer, Beata Gocyk–Farber, John C. Browne, Jennifer L. Edlind, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant, Barrack Rodos Bacine, Philadelphia, PA, for Lead Plaintiff in the Securities Litigation.

William S. Lerach, Darren J. Robbins, Spencer Burkholz, Michael J. Dowd, Randall Baron, Thomas E. Egler, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Melvyn I. Weiss, Steven G. Schulman, Sol Schreiber, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Patrick J. Coughlin, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Gregg D. Renkes, Attorney General, Michael A. Barnhill, Assistant Attorney General, Juneau, AK, for Plaintiffs State of Alaska Dept. of Revenue and Alaska State Pension Investment Board.

Neil L. Selinger, David C. Harrison, Todd S. Garber, Lowey Dannenberg Bemporad & Selinger P.C., White Plains, NY, Liaison Counsel for Individual Action Plaintiffs as amici curiae.

David Wertheimer, Lyndon Tretter, Hogan & Hartson, New York, NY, for Defendant Bernard J. Ebbers.

R. David Kaufman, M. Patrick McDowell, Brunini Grantham Grower & Hewes PLLC, Jackson, MS, for Defendant Bernard J. Ebbers, of counsel.

Paul Curnin, David Elbaum, Simpson Thacher & Bartlett LLP, New York, NY, for Director Defendants.

Jay B. Kasner, Susan L. Saltzstein, Steven J. Kolleeny, Skadden Arps Slate Meagher & Flom LLP, New York, NY, for Underwriter Defendants.

Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Walter Rieman, Marc Falcone, Joyce S. Huang, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, Robert McCaw, Peter K. Vigeland, Wilmer Cutler & Pickering, New York, NY, for Defendants Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup Inc., and Jack Grubman.

## OPINION & ORDER

COTE, District Judge.

On June 25, 2002, WorldCom, Inc. ("WorldCom") declared that it would undertake a massive restatement of its financial statements. Shortly thereafter, it filed the largest bankruptcy in United States history.

Even before WorldCom's June 25 announcement, the first class action alleging WorldCom claims was filed in the Southern District of New York on April 30, 2002 and assigned to this Court. Subsequent class actions were filed here and transferred to this Court by the Judicial Panel on Multi–District Litigation ("MDL Panel"). The class actions were consolidated for pre-trial purposes by Order dated August 15, 2002.

Numerous actions alleging individual, but not class, claims have also been filed in

venues across the country, primarily in state courts ("Individual Actions"). The majority of those actions have been removed to federal court as "related to" the WorldCom bankruptcy and transferred to this Court. By Order dated December 23, 2003 ("December 23 Order"), the Court found that the Individual Actions and the securities class actions involved common questions of law and fact, and that consolidation of these actions for pretrial proceedings was necessary. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2002 WL 31867720, at *1 (S.D.N.Y. Dec.23, 2002). The Individual Actions were consolidated with the Class Action for pre-trial purposes by Opinion and Order dated May 28, 2003. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 2003 WL 21242882 (S.D.N.Y. May 28, 2003).

Of the Individual Actions, approximately forty-seven have been filed in state courts beginning on July 5, 2002, and most recently on October 3, 2003, by the law firm

Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") on behalf of over one hundred twenty private and public pension fund clients. ("Milberg Weiss Actions"). The Milberg Weiss Actions allege claims under the Securities Act of 1933 ("Securities Act"), but not under the Exchange Act of 1934 ("Exchange Act").[1] The allegations in the complaints filed in each of the Milberg Weiss Actions are similar, but not identical. This Opinion addresses a motion to dismiss one of the Milberg Weiss Actions.[2]

The first motion to dismiss in this consolidated securities litigation was made against the Consolidated Class Action Complaint. By Opinion and Order dated May 19, 2003, defendants' motions to dismiss the Class Action Complaint were denied with limited exceptions.[3] *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21219049 (S.D.N.Y. May 19, 2003). By Opinion and Order dated October 24, 2003, the lead plaintiffs' motion to certify a class was granted.[4]

---

1. The Milberg Weiss Actions have been drafted to avoid the removal and class action provisions of the federal securities laws. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21219037, at *1 (S.D.N.Y. May 22, 2003).

2. The Order scheduling this motion to dismiss was entered on September 22, 2003. The motion was filed on October 3, and fully submitted on October 31. On November 10, Milberg Weiss filed a motion requesting that this Court defer consideration of any pending motions impacting their cases and defer distribution of the notice to the Class while they await resolution by the Second Circuit, in the event their motion for certification of an interlocutory appeal is granted and accepted by the Court of Appeals, of the legality of the removal of the Milberg Weiss Actions to federal court. By Order dated November 19, any party opposing the Milberg Weiss Actions' November 10 motion is required to so inform the Court by December 1. The Court declines to delay a decision on the motion to dismiss

to await the completion of briefing on the November 10 Milberg Weiss motion.

3. The Exchange Act Section 10(b) claims against four WorldCom directors who were members of the Audit Committee ("Audit Committee Defendants") were dismissed with leave to amend. The motions by WorldCom's auditors and accountants were addressed in an Opinion and Order dated June 24, 2003. Arthur Andersen LLP's motion to dismiss was denied; the motions to dismiss filed by related entities and individuals were granted. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21488087 (S.D.N.Y. June 24, 2003).

4. The certified class consists of all persons and entities who purchased or otherwise acquired publicly traded securities of WorldCom during the period beginning April 29, 1999 through and including June 25, 2002, and who were injured thereby, including all persons or entities who acquired shares of WorldCom common stock in the secondary market or in exchange for shares of acquired

See *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22420467 (S.D.N.Y. Oct.24, 2003).

As noted, this Opinion addresses a motion to dismiss one of the Individual Actions. It is one of two motions that comprise the first tranche of motions to dismiss claims common to many Individual Actions.[5] It is brought against the complaint filed by Milberg Weiss on behalf of two Alaska plaintiffs ("MW Alaska Action" and "Complaint"), and raises two issues: (1) the statute of limitations for claims under Sections 11 and 12(a)(2) of the Securities Act, and (2) whether the sale of WorldCom debt securities in December 2000 supports a Securities Act Section 12(a)(2) claim.

In addition to the plaintiffs in the MW Alaska Action, plaintiffs from all of the other Individual Actions before this Court ("Amici") have been permitted to oppose this motion through the submission of a single joint amicus brief. As described in

an Order of September 22, the parties in each of the Individual Actions will be permitted to show why the Opinion issued today in the MW Alaska Action should not govern the same issues to the extent that the defendants move to dismiss claims in their Individual Actions based on this Opinion.

*Complaint*

The Alaska Plaintiffs filed their original complaint ("Initial Complaint") on April 21, 2003. On August 22, 2003, the MDL Panel transferred the action to this Court. Some five months after the filing of the Initial Complaint, the Alaska Plaintiffs filed an amended complaint dated September 24, 2003 ("Complaint").[6] The principal changes in the Complaint relevant to this motion to dismiss were the inclusion of ten additional members of the underwriting syndicates for the bond offerings and the addition of fifteen individual defendants. With their opposition to this motion, they

---

companies pursuant to a registration statement, and all persons or entities who acquired debt securities of WorldCom in the secondary market or pursuant to a registration statement (the "Class"). *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22420467, at *2, 36.

5. Certain defendants have moved to dismiss securities fraud claims in the Individual Action captioned *Public Employees Retirement Sys. of Ohio v. Ebbers*, No. 03 Civ. 338(DLC) ("Ohio Action"), on statute of limitations grounds. The Ohio Action is not one of the Milberg Weiss Actions, and will be addressed in a separate Opinion. The second tranche of motions to dismiss claims common to many Individual Actions will be fully submitted on December 5, 2003, and will address preemption issues under the Securities Litigation Uniform Standards Act of 1998, and issues specific to holding companies.

6. Although the docket sheet for this action in the Southern District of New York reflects that the Complaint was filed on October 21, 2003, the Alaska Plaintiffs attempted to file the Complaint on or about September 24.

The filing was initially rejected due to uncertainty that arose regarding the timeliness of the filing as governed by the May 28 Consolidation Order. The May 28 Consolidation Order provides that any Individual Action transferred to this Court after July 11, 2003,

> shall have the later of July 11, 2003, *or twenty-one days following arrival on this Court's docket to file an amended complaint.* No further amendments of any complaint in an Individual Action will be permitted without permission of the Court.

The Complaint in the Alaska Action was filed more than three weeks after the Alaska Action was first assigned a Southern District docket number, and was rejected as untimely. The Clerk of Court did not receive the file and certified docket from the transferor court, however, until September 17. As explained in an Order of October 7 issued to clarify the trigger dates described in the May 28 Order, *see In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22299350, at *2 (S.D.N.Y. Oct.7, 2003), the September attempted filing of the Complaint in the Alaska Action was timely.

have submitted proposed insertions to further amend the Complaint.

The following summarizes the allegations in the Complaint relevant to this Opinion. The Complaint contains two claims alleging violations of the Securities Act arising out of the purchase of WorldCom debt securities sold during four bond offerings: the August 1998 ("1998 Offering"), May 2000 ("May 2000 Offering"), December 2000 ("December 2000 Offering"), and May 2001 ("2001 Offering") offerings (together, the "Offerings").

It alleges that in August 1998, WorldCom conducted an offering of debt securities worth over $6 billion pursuant to a registration statement with an effective date of August 7, 1998. On May 12, 2000, WorldCom conducted a public debt offering through which it sold $5 billion in bonds pursuant to a registration statement filed with the SEC. In December 2000, WorldCom and J.P. Morgan raised approximately $2 billion from a bond private placement. The December 2000 private placement was exempt from the registration requirements imposed by the SEC and was conducted pursuant to an Offering Memorandum dated December 14, 2000 ("Offering Memorandum"). Finally, on May 9, 2001, WorldCom conducted an $11.8 billion bond offering pursuant to a registration statement filed with the SEC.[7]

The Complaint explains that the "action involves solely strict liability and negligence claims." The first claim pleads a violation of Section 11 of the Securities Act against underwriters, individual defendants and WorldCom's auditor for misrepresentations in three of the four Offerings: the 1998, May 2000, and 2001 Offerings. The second claim pleads a violation of Section 12(a)(2) of the Securities Act against J.P. Morgan Chase & Co. ("J.P.Morgan") arising from misrepresentations in connection with the December 2000 Offering.

*The Parties*

The plaintiffs are the State of Alaska Department of Revenue, a state agency that collects and invests public funds, and the Alaska State Pension Investment Board, a state entity that manages and invests state pensions funds ("Alaska Plaintiffs"). Together, the Alaska Plaintiffs purchased bonds issued during each of the four Offerings.

The Complaint names the following WorldCom executives and directors as individual defendants: Bernard J. Ebbers, WorldCom's former President and Chief Executive Officer; Scott D. Sullivan,[8] the former Executive Vice President and Chief Financial Officer; and WorldCom directors John W. Sidgmore, Clifford Alexander, Jr., James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett, Jr., Gordon S. Macklin, John A. Porter, Bert C. Roberts, Lawrence C. Tucker, and Juan Villalonga ("Individual Defendants").[9] None of the Individual Defendants is named in the Initial Complaint.

The Initial Complaint and the Complaint also name underwriter defendants Citigroup, Inc., Salomon Smith Barney, Inc., J.P. Morgan Chase & Co., J.P. Morgan Securities Inc., Bank of America

7. The May 2000 and 2001 Offerings are also the basis for Securities Act Section 11 claims in the Consolidated Class Action. The 1998 and December 2000 Offerings are not. In addition to the Section 11 claims, the Consolidated Class Action brings Section 12(a)(2) claims, and in connection with certain defendants Exchange Act Section 10(b) claims, based on the May 2000 and 2001 Offerings.

8. Litigation against Sullivan was stayed by Order dated December 5, 2002.

9. With the exception of Villalonga, all of the individual defendants named by the Complaint are also defendants in the Consolidated Class Action.

Corp., Banc of America Securities LLC, ABN Amro Inc., Deutsche Bank AG, Deutsche Bank Alex. Brown Inc., Lehman Brothers Holdings Inc., Lehman Brothers Inc., Credit Suisse Group, Credit Suisse First Boston Corp., Goldman Sachs Group, Inc., Goldman Sachs & Co., UBS Warburg LLC, NationsBanc Montgomery Securities LLC. The Complaint added the following underwriters as defendants: Utendahl Capital Partners, L.P., Blaylock & Partners, L.P., BNP Paribas Securities Corp., Fleet Securities, Inc., Tokyo–Mitsubishi International PLC, Westdeutsche Landesbank Girozentrale, Caboto Holding SIM S.p.A., Caboto–Gruppo Intesabei, Robertson Stephens International Ltd., and Mizuho International PLC ("Additional Underwriter Defendants," and together "Underwriter Defendants").[10] Arthur Andersen LLP, WorldCom's auditor, is also named as a defendant in both the Initial Complaint and the Complaint.[11]

*False Financial Reporting*

The Complaint alleges that as early as 1998, WorldCom was using a variety of accounting devices that artificially inflated WorldCom's reported assets, net worth, and cash flow. It identifies, in particular, WorldCom's improper accounting treatment of sales, "line costs,"[12] merger reserves and acquisitions, impaired goodwill, records of revenue, uncollectible receivables, and software development costs. One of the examples of improper accounting described is WorldCom's treatment of goodwill and property, plant and equip-

ment value in connection with its acquisition of MCI, which is alleged to have artificially inflated WorldCom's reported earnings by hundreds of millions of dollars. The WorldCom SEC filings that were incorporated into the registration statements and Offering Memorandum at issue in the Offerings were materially false and misleading as a result of these accounting improprieties.

*Discovery of the Fraud*

The Complaint alleges that "a series of revelations that quickly destroyed WorldCom" began in February 2002. In February 2002, WorldCom slashed its revenue and earnings forecasts for the year, and revealed that it would write-down between $15 and $20 billion of the impaired value of prior acquisitions. On April 22, WorldCom again cut its revenue and earnings forecasts for 2002. At the time, analysts suggested that WorldCom's write-downs due to the impaired value of acquisitions would amount to more than $45 billion. Rating agencies reduced WorldCom's credit rating to "junk" status by April 24, and CEO Ebbers was forced to resign. As a result, WorldCom bonds "plunged in value." On June 13, WorldCom's CEO in effect admitted that the May 2001 Offering had been necessary to prevent the financial collapse of WorldCom.

On June 25, 2002, WorldCom announced that it had improperly treated more than $3.8 billion in ordinary costs as capital expenditures and would have to restate its

---

**10.** With the exception of Robertson Stephens International, Ltd. and NationsBanc Montgomery Securities LLC, all of the Underwriter Defendants named by the Complaint are also named defendants in the Consolidated Class Action. NationsBanc was an underwriter for the 1998 Offering only, after which it merged into Bank of America, which is a defendant in the Consolidated Class Action. Robertson Stephens was an underwriter for the 2001 Offering.

**11.** Andersen is also a defendant in the Consolidated Class Action.

**12.** Line costs are the costs incurred by WorldCom's long-term lease agreements with various telecommunications carriers to allow WorldCom to use the carriers' networks to carry the calls of WorldCom's customers.

publicly-reported financial results for 2001 and the first quarter of 2002. WorldCom later announced that its reported earnings for 1999 through the first quarter of 2002 had been affected by manipulation of various reserves and had overstated earnings by $3.3 billion. WorldCom has admitted that its financial results were overstated by $9 billion from 1999 through the first quarter of 2002. By March 2003, news reports suggested that WorldCom had misstated its accounting by approximately $11 billion.

*Discussion*

The Underwriter Defendants have moved to dismiss the Complaint on the ground that it is barred by the statute of limitations.[13] They contend that the claim for the 1998 Offering is barred since the Initial Complaint was filed more than three years after that offering. They contend that every claim in the Initial Complaint is time-barred since the plaintiffs were on inquiry notice as of April 20, 2002, more than one year before the Initial Complaint was filed, and that in any event, the Section 11 claim against the Additional Underwriter Defendants and the Individual Defendants added to the Complaint in September 2003 is time-barred. Finally, they contend that the December 2000 Offering was a private placement and therefore is not covered by the sole claim made in connection with that offering, the Section 12(a)(2) claim.

The discussion of these issues begins with a brief description of the statutory framework that will govern this motion. The claims are brought under Sections 11 and 12(a)(2) of the Securities Act. The statute of limitations provisions that are at issue are contained in Section 13 of the Securities Act and in the Sarbanes–Oxley

Act passed in response to the WorldCom debacle.

*Section 11*

Section 11 of the Securities Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(a). "The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

*Section 12(a)(2)*

Section 12(a)(2) of the Securities Act, previously known as Section 12(2), allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77*l*(a)(2).

*Section 13*

Section 13 of the Securities Act sets forth the statute of limitations for Securities Act claims. It provides:

> No action shall be maintained to enforce any liability created under section 77k [Section 11] or 77*l*(a)(2) [Section 12(a)(2)] of this title unless brought *within one year after the discovery of the untrue statement or the omission,* or

---

**13.** All defendants, with the exception of Sullivan against whom litigation is stayed, join in

the Underwriter Defendants' motion.

after such discovery should have been made by the exercise of reasonable diligence.... *In no event shall any such action be brought* to enforce a liability created under section 77k or 77*l*(a)(2) of this title *more than three years after the security was bona fide offered to the public,* or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m (emphasis supplied). Thus, under Section 13, plaintiffs must bring suit by the earlier of (a) three years from the date the parties in the offering "obligate themselves to perform," in the case of a Section 12(a)(2) claim, *see Finkel v. Stratton Corp.,* 962 F.2d 169, 173 (2d Cir.1992) (citation omitted), or three years from the date of the initial registration statement, in the case of a Section 11 claim, *id.* at 174 (citation omitted), or (b) one year from the date on which they are put on actual or constructive notice of the facts underlying the claim. *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993).

*Sarbanes–Oxley Act*

On July 30, 2002, Congress enacted the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley"). Section 804 of Sarbanes–Oxley lengthened the statute of limitations for private causes of action alleging securities fraud. *See* 28 U.S.C. § 1658 ("Section 804"). Section 804 is entitled "Statute of Limitations for Securities Fraud" and provides in pertinent part that

a private right of action that involves a claim of *fraud, deceit, manipulation, or contrivance* in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the [Exchange Act] [15 U.S.C. § 78c(47)], may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the

violation; or (2) 5 years after such violation.

28 U.S.C. § 1658 (emphasis supplied).

1. *Application of Sarbanes–Oxley to Sections 11 and 12(a)(2) Claims*

■ The defendants move to dismiss the claim based on the 1998 Offering as time-barred by the statute of limitations period contained in Section 13, which requires the Securities Act claim to be filed by the earlier of three years after the date of the registration statement for the 1998 Offering or one year from the date the plaintiff is on actual or constructive notice. The Underwriter Defendants contend that because the MW Alaska Action was filed on April 21, 2003, more than four years after the 1998 Offering was offered to the public, the claim based upon the 1998 Offering is time barred.

In response, the Alaska Plaintiffs contend that Section 804 of Sarbanes–Oxley governs and that they had until the earlier of five years from the offering or two years from the date of notice to bring their action. Although the Alaska Plaintiffs' Section 11 claim for the 1998 Offering would have expired under Section 13 in August 2001, almost a year before Sarbanes–Oxley was passed, the Alaska Plaintiffs argue that the Sarbanes–Oxley limitations period should be retroactively applied to extend the statute of limitations for their claim. Plaintiffs do not dispute that if Section 13 applies to their 1998 claims, the 1998 claims are time-barred.

Construction of a statute "must begin with the words of the text." *Saks v. Franklin Covey Co.,* 316 F.3d 337, 345 (2d Cir. 2003); *see Mallard v. United States Dist. Court,* 490 U.S. 296, 300–01, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). Whether the meaning of the statute is plain or ambiguous "is determined by reference to the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *see also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *United States v. Dauray,* 215 F.3d 257, 260–61 (2d Cir.2000). A court must "give effect, if possible, to every clause and word of a statute." *State St. Bank & Trust Co. v. Salovaara,* 326 F.3d 130, 139 (2d Cir.2003) (citation omitted). A particular section of a statute should "be understood in context with and by reference to the whole statutory scheme...." *Auburn Housing Auth. v. Martinez,* 277 F.3d 138, 144 (2d Cir.2002); *see also Saks,* 316 F.3d at 345. In addition, comparison to other similar statutory provisions, *Mallard,* 490 U.S. at 305–07, 109 S.Ct. 1814, and the statute's legislative history may be used to resolve ambiguity. *Dauray,* 215 F.3d at 264; *Auburn Housing Auth.,* 277 F.3d at 143–44.

The only other courts to have confronted this question have concluded, without discussion, that Section 13 still applies to Sections 11 and 12(a)(2) claims. *See In re Merrill Lynch & Co. Research Sec. Litig.,* 272 F.Supp.2d 243, 265 (S.D.N.Y.2003); *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957 (W.D.Wis.2003). Their conclusion is compelled by the text of Sarbanes–Oxley, the text of other securities statutes, relevant precedent, and the legislative history of Sarbanes–Oxley.

Section 804 extends the statute of limitations for claims that involve "fraud, deceit, manipulation, or contrivance" in contravention of the "securities laws," which it defines to include the Securities Act as well as the Exchange Act.[14] *See* 28 U.S.C. § 78c(a)(47). The question presented here is whether the Securities Act claim alleged by the Alaska Plaintiffs is a claim involving "fraud, deceit, manipulation or contrivance" that is subject to Section 804's longer statute of limitations.

The Complaint's Section 11 claim does not sound in fraud.[15] The Complaint repeatedly disavows that its claims are anything other than strict liability or negligence claims, and explicitly states that its claims do not allege fraud. For example, the opening paragraph of the Complaint pleads that the action "involves solely strict liability and negligence claims." Each claim for relief pleads that "[p]laintiffs assert only strict liability and negligence claims. Plaintiffs do *not* assert claims of fraud or intentional misconduct." (Emphasis in original.)

Plaintiffs' limitation of their Section 11 claim is not exceptional. To state a claim for violation of Section 11, plaintiffs only need allege that "material facts have been omitted" from a registration statement or "presented in such a way as to obscure or distort their significance...." *I. Meyer*

---

**14.** Section 804 states that it applies to claims under the "securities laws as defined by section 3(a)(47)" of the Exchange Act. Section 3(a)(47) provides:

The term 'securities laws' means the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the Securities Investor Protection Act of 1970.

15 U.S.C. § 78c(47) (citations omitted). Given this definition, defendants do not contend that Section 804 could *never* apply to *any* Securities Act claims.

**15.** Although this prong of the defendants' motion only addresses the Section 11 claim based on the 1998 Offering, it is also true that the Complaint's Section 12(a)(2) claim does not sound in fraud.

*Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (citation omitted). Because of its minimal proof requirements, Section 11 creates extensive liability for issuers and those involved in the preparation and dissemination of the registration statements filed in the context of a public offering. A Section 11 claim like that alleged here is not held to the heightened pleading standard required of fraud allegations by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21219049, at *27–28.

Admitting that their claim does not sound in fraud, the Alaska Plaintiffs nonetheless argue that their claim arises from WorldCom's accounting manipulations and therefore involves a sufficient use of a "manipulation or contrivance" to bring them within the scope of Section 804. Amici argue that by including "deceit, manipulation or contrivance" as well as "fraud" in Section 804, Congress signified its intent to extend Section 804 beyond Section 10(b) securities fraud claims to reach Sections 11 and 12(a)(2) claims. They assert that Sections 11 and 12(a)(2) codified the common law doctrine of deceit.

In the context of the securities laws, "deceit," "manipulation" and "contrivance" refer to securities fraud. The language of Section 804 directly mirrors that of Section 10(b) and Rule 10b–5, which provides the private cause of action for securities fraud.[16] Section 10(b) provides that it is unlawful "[t]o use or employ ... any *manipulative or deceptive device or contrivance in contravention of such rules and regulations.*" 15 U.S.C. § 78j(b). Rule 10b–5 describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly to "employ any *device, scheme, or artifice to defraud*" or to "engage in any act, practice, or course of business which operates or *would operate as a fraud or deceit upon any person* ...." 17 C.F.R. § 240.10b–5; *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Section 17 of the Securities Act, 15 U.S.C. § 77q, the criminal securities fraud provision, employs similar language. Section 17 prohibits, among other things, "employ[ing] any device, scheme or artifice to defraud." 15 U.S.C. § 77q(a)(1).

The requirement of pleading and proving scienter in a Section 10(b) claim comes directly from this statutory language. As the Second Circuit has observed, "[t]he requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is *an intent to deceive, manipulate or defraud.*" *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citation omitted) (emphasis supplied). In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court drew on the statutory text and interpretations of that text to find that negligence does not give rise to Section 10(b) claims, which are limited by the text of the statute to fraud. *Id.* at 199, 96 S.Ct. 1375. In *Hochfelder*, the Court explained that "the words 'manipulative', 'deceit,' and 'contrivance' ... make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence." *Id.* (emphasis supplied). In particular, it held that the

---

**16.** Prior to Sarbanes–Oxley, the statute of limitations for Exchange Act claims provided that "no action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 n. 9, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

"[u]se of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.*

Section 804 parallels the private causes of action for securities fraud: it extends the statute of limitations for "a claim of *fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement.*" 28 U.S.C. § 1658 (emphasis supplied). These terms are not found in Section 11 (or Section 12(a)(2)), which refers only to material misrepresentations or omissions in certain documents required to be filed with the SEC. *See* 15 U.S.C. §§ 77k & 77*l*(a)(2).

As a rule, legislative history should be used only to resolve ambiguity, *see Dauray*, 215 F.3d at 264, a problem not presented by Section 804. In this case, however, the legislative history is noteworthy because Sarbanes–Oxley was enacted a month after WorldCom declared bankruptcy and the legislative record is replete with references to the company's collapse. Plaintiffs and Amici rely heavily on the legislative history to argue that WorldCom's massive restatements and its investors' losses weighed heavily on Congress.

The legislative history on which the Alaska Plaintiffs and Amici rely leaves little doubt that Congress was concerned about the emerging accusations of wrongdoing at WorldCom. But, the portions of the record to which they point indicate that in the debate that produced Section 804 and its lengthened statute of limitations, congressional concern focused on the securities fraud at WorldCom.

For example, Amici emphasize that Senator Patrick Leahy, a sponsor of the portion of the Act that included Section 804, noted that the Act was designed to provide an opportunity "when there has been *such*

*enormous fraud* and all the pension funds have been lost, and all the people have lost their life savings—[to] give them at least some chance to recover something.... We go two-five instead of one-three." 148 Cong. Rec. S6524, 6535 (July 10, 2002) (emphasis supplied). Similarly, in the House debate on the statute of limitations, Representative Edward J. Markey stated: "we should extend from 3 years to 5 years the time that people have to go in and do something about *fraud ....*" 148 Cong. Rec. H4838, 4846 (July 17, 2002)(emphasis supplied). The Alaska Plaintiffs emphasize Senator Leahy's statement that Section 804 "is intended to lengthen any statute of limitations under federal securities law." 148 Cong. Rec. S7418 (daily ed. July 26, 2002). Read in context, however, even this seemingly broad comment is limited to claims alleging securities fraud. Immediately under the caption "Section 804—Statute of Limitations," Senator Leahy stated:

> This section would set the statute of limitations *in private securities fraud cases* to the earlier of two years after the discovery of the facts constituting the violation or five years afer such violation. The current statute of limitations *for most private securities fraud cases* is the earlier of three years from the date of the fraud or one year from the date of discovery. This provision states that it is not meant to create any new private cause of action, but only to govern all the already existing private causes of action under the various federal securities laws that have been held to support private causes of action. This provision is intended to lengthen any statute of limitations under federal securities law, and to shorten none.

*Id.* (emphasis supplied). As Senator Leahy himself stated, Section 804 "set[s] the statute of limitations in private securities fraud cases," not strict liability and negligence claims under Sections 11 and 12.

If Congress had intended to extend the statute of limitations for every private securities law claim, it could have done so. Section 804 does not, however, state that it extends the statute of limitations for all claims under the securities laws. Instead, it includes limiting language that extends the time for private causes of action under the securities laws only for claims that involve "fraud, deceit, manipulation or contrivance." This language does not encompass Sections 11 and 12(a)(2) claims.

There are advantages to bringing solely strict liability and negligence claims: the pleading and proof thresholds are far lower than for claims asserting securities fraud, and liability is "extensive."[17] One of the disadvantages of bringing negligence claims, however, is a more narrow window of time in which to sue. Because Section 13, not Section 804, applies to the Section 11 claim arising from the 1998 Offering, that claim expired in August 2001 and is time-barred.[18]

### 2. *Inquiry Notice as of April 20, 2002*

The Underwriter Defendants contend that the Alaska Action is time-barred because it was commenced more than one year after the plaintiffs were on inquiry notice of the basis of their claims. The Initial Complaint in the Alaska Action was filed on April 21, 2003.

■ The one-year limitations period of Section 13 "begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable dili-gence, would have led to actual knowledge." *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir.2003) (citation omitted). A duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action. *Id.* (citation omitted).

■ Knowledge of a cause of action is imputed in two different ways, depending on whether the investor undertakes to inquire. *LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir.2003). "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor in the exercise of reasonable diligence, should have discovered" concerning the wrongdoing. *Id.* (citation omitted). If the facts appearing in the complaint and related documents give rise to a duty of inquiry, "it is appropriate to require a plaintiff, resisting a motion to dismiss on limitations grounds, at least to allege that inquiry was made." *Id.* at 156.

■ The circumstances giving rise to the duty to inquire are referred to as "storm warnings." *See Levitt*, 340 F.3d at 101. The financial information that triggers the storm warnings "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003). An inves-

---

**17.** It would appear that the plaintiffs believed that another advantage in pleading individual claims under the Securities Act, as opposed to the Exchange Act, was that they could sue in state rather than federal court. State and federal courts have concurrent jurisdiction over Securities Act claims. *See In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 328 (S.D.N.Y.2003). Due to WorldCom's bank-ruptcy, however, the Individual Actions that pleaded solely Securities Act claims were nonetheless properly removed as "related to" the WorldCom bankruptcy. *Id.* at 328–29.

**18.** Having concluded that Section 804 of Sarbanes–Oxley does not apply to the plaintiffs' claims, it is unnecessary to consider whether the statute could be retroactively applied.

tor does not, however, "have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 351–52. To trigger the duty to inquire, the wrongdoing indicated by the storm warnings "must be probable, not merely possible." *Newman*, 335 F.3d at 193 (citation omitted). For example, the Second Circuit has found that inquiry notice existed when there were three substantial reserve charges in increasing amounts within four years, *LC Capital*, 318 F.3d at 155, and when the necessary disclosures of the wrongdoing were contained in prospectuses, *Dodds*, 12 F.3d at 351.

■ In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice "because the warning signs are accompanied by reliable words of comfort from management." *LC Capital*, 318 F.3d at 155. While such statements must be considered, their existence will prevent or dissipate the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *Id.* "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." *Id.*

Whether a plaintiff was placed on inquiry notice "is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)" but, if the facts needed to make the determination "can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Id.* at 156 (citation omitted); *see also Dodds*, 12 F.3d at 352 n. 3. The Second Circuit has resolved the question of inquiry notice on a motion to dismiss "in a vast number of cases." *LC Capital*, 318 F.3d at 156 (citation omitted).

■ The Underwriter Defendants' motion requires a determination as to whether plaintiffs were on notice of their potential claims as of April 20, 2002. Because the Alaska Plaintiffs do not contend, either in the Complaint or their proposed amendments to their pleading, that they undertook any inquiry at any time prior to December 2002, knowledge is imputed as of the date their duty to inquire arose. *See id.* at 154; *Levitt*, at 101. The following describes the allegations in the Complaint and the 2002 news reports [19] on which the parties have relied in arguing this motion.

*February 2002*

The Complaint alleges that WorldCom took a $15–20 billion write-down for the impaired value of prior acquisitions in February 2002.[20] A February 7 Associated

**19.** The articles are appropriately considered on a motion to dismiss. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

**20.** Although the February write-down announcement involved a substantial sum, it followed shortly after the implementation of new accounting guidelines for the treatment of goodwill. None of the parties submitted the text of WorldCom's February 2002 write-down announcement. Analyst reports, however, describe the write-down as an effort to comply with the new standards ("FAS 142")

set by the Financial Accounting Standards Board, as does an article in *Business Week* cited by plaintiffs in the first class action complaint filed in connection with World-Com. *See Albert Fadem Trust v. Ebbers,* No. 02 Civ. 3288(DLC). FAS 142 required companies to write-down goodwill to reflect any permanent decline in the value of acquisitions for fiscal years beginning after December 15, 2001, but encompassing acquisitions made after June 30, 2001. *See* Financial Accounting Standards Board, Financial Accounting Services, Statement of Financial Accounting

Press ("AP") report opined that the effects of "concerns about [WorldCom's] debt burden and fallout from the Enron scandal and related accounting practices" had contributed to "spiraling stock prices." The AP report also noted that Ebbers and other executives had "sought to dismiss concerns about WorldCom's accounting practices, debt load and cash flow" during a conference call with investors and analysts.

A February 3 article in the *New York Times* discussed the aftermath of the Enron debacle, and noted that "the stock market plunged on concerns that hidden financial practices like those that felled Enron could affect other companies, particularly in energy and in banking" and noted that WorldCom shares, among others "sank sharply." Another article that day in the *Financial Times* reported that WorldCom had "delivered a spirited rebuttal of the accusations and rumours swirling around it," and observed that "WorldCom's accounting seems straightforward."

On February 9, the *Financial Times* reported that investors in United States equity markets were "jittery about the growing list of companies coming under scrutiny" over their accounting practices. The article noted that "even the reassurances of top executives from several companies, including WorldCom, Tyco and Whirlpool, that their accounting problems were exaggerated or false, failed to bolster markets."

*March*

A March 4 *Forbes* article discussed WorldCom in some detail. The article identifies WorldCom as one of four stocks to avoid due to potential accounting problems. In particular, the *Forbes* article discussed WorldCom's accounting of property, plant and equipment assets from the MCI acquisition, and its treatment of the

$14.1 billion purchase price for MCI. The article explained that "WorldCom artificially depressed the depreciation charges it is taking on MCI's assets," inflating WorldCom's reported earnings by ten percent. The March 4 *Forbes* article also described the accounting improprieties associated with WorldCom's write-offs. It observed that after WorldCom acquired MCI, the company reclassified approximately $3.4 billion of MCI's property, plant and equipment value as goodwill, and explained that WorldCom's accounting treatment was designed to inflate profits. The *Forbes* article suggested that the improper categorization of MCI's assets as goodwill artificially depressed the depreciation charges taken by WorldCom and may have inflated the company's earnings by close to $700 million.

On March 11, WorldCom announced that it had received a confidential request from the SEC for voluntary production of documents and information relating to accounting policies, tracking and review of analysts' earnings estimates, and federal or state agency investigations of WorldCom, among other things. A March 12 *New York Times* article described the SEC request as an "unusually wide-ranging letter," and noted that WorldCom's outside accountant Arthur Andersen had also served as the auditor for Enron and Global Crossing, companies whose accounting had come under scrutiny after they filed for bankruptcy protection. The report noted that investors were not comforted by the SEC's customary caution that the investigation should not be seen as "an adverse reflection" on the company or its securities.

The SEC investigation of WorldCom was also reported by CNBC on March 12, 2002. The next day, a detailed article appearing in the *New York Times* report-

Standards No. 142, Goodwill and Other In-    tangible Assets (2001).

ed the commencement of the SEC's "sweeping" investigation into whether WorldCom "improperly manipulated its financial reports." The article quoted a telecommunications analyst who observed that in the twelve years he had been following the industry, he had "never seen an SEC request like this" and noted that WorldCom may have taken "too many risks" with its accounting. The March 13 article noted that Ebbers's focus on costs had "drawn concern that the company may be too ambitious in taking one-time charges against its earnings—like improperly masking operating losses as one-time charges that might make its operating results appear stronger than they really are." The article also observed that the SEC investigation reflected an interest in WorldCom's accounting practices in connection with its many acquisitions.

In proposed amendments to their pleading, the Alaska Plaintiffs describe statements from WorldCom and Ebbers that plaintiffs contend neutralized the February and March adverse press reports. On March 11, 2002, WorldCom commented that "all of its policies, practices, and procedures have complied, and continued to comply, with all applicable accounting standards and laws" and Ebbers told "fund managers and analysts" that he was "not aware of any information that would give rise to this inquiry other than newspaper articles." [21] The Alaska Plaintiffs add that outside analyst Jack Grubman "issued the strongest denial" on March 11, when he commented that "we view" the SEC inquiry "as a very straightforward—almost boilerplate—letter of inquiry" to WorldCom.[22]

*April*

(The Complaint was filed on April 21, 2003). According to the Complaint, on April 22, analysts increased their estimates of WorldCom's write-down of goodwill to $45 billion; on April 24, WorldCom debt was downgraded to "junk" status; and on April 30, Ebbers resigned under pressure.

The allegations in the Complaint and the publicly available documents to which the parties have pointed do not establish as a matter of law that the Alaska Plaintiffs were on inquiry notice of their claims as of April 20, 2002. While the press reports certainly show that there were serious, publicly expressed concerns about WorldCom before that date, those reports do not necessarily constitute the full-blown storm warnings that trigger a duty of inquiry. The February write-down appears to have been caused by a change in accounting guidelines. None of the press reports identify particular statements by WorldCom itself that would sufficiently alert an investor to her potential claims. The service of a sweeping SEC subpoena is also an insufficient trigger. It does not reveal, by itself, any particular accounting irregularity. The greatest cause for concern came from the collapse of other companies, the fall of WorldCom's securities prices and a few penetrating articles, most notably the March 4 *Forbes* article.

The March 4 *Forbes* article describes problems with WorldCom's accounting for MCI's goodwill, and how it was designed to inflate profits. This is one of the accounting improprieties at the heart of the Initial Complaint. While this article, and

---

**21.** The proposed amendments do not identify the source of these statements.

**22.** The proposed amendments do not identify the source or clarify to whom Grubman was referring as "we." Presumably Grubman was referring to himself and to his employer,

Salomon Smith Barney. Although there are extensive allegations in the Class Action Complaint that Grubman functioned as a WorldCom insider, the Complaint and proposed amendments do not contain allegations that Grubman was speaking on behalf of WorldCom.

all of the other press reports before April 20, create a question of fact as to whether the Alaska Plaintiffs were on inquiry notice as of that date, they do not establish as a matter of law a probability of misconduct sufficient to trigger inquiry notice. *See Newman*, 335 F.3d at 193.

The cases on which the Underwriter Defendants particularly rely are readily distinguishable. The events at issue in those cases projected far more developed warnings to the investing public than were present here before April 20, 2002. In *LC Capital*, "a series of three charges in substantial and increasing amounts for the same purpose within four years" was sufficient to "alert any reasonable investor that something is seriously wrong." *LC Capital*, 318 F.3d at 155. Similarly, in *de la Fuente v. DCI Telecomm., Inc.*, 206 F.R.D. 369 (S.D.N.Y.2002), the company restated its financials in two SEC filings and disclosed that it had revised its accounting at the request of the SEC. *Id.* at 382. In addition, the SEC ordered a ten day suspension in trading defendant's stock. *Id.* In *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678 (S.D.N.Y.2000), the article that put the plaintiffs on inquiry notice discussed precisely the information alleged as the basis for plaintiffs' action, including the material omissions in the prospectus. *Id.* at 692. In addition, the *Ultrafem* registration statements themselves contained a description of product flaws similar to those underlying plaintiffs' claims. *Id.* In *Westinghouse Elec. Corp. v. 21 Int'l Holdings, Inc.*, 821 F.Supp. 212 (S.D.N.Y.1993), there were more than five analyst reports that suggested that the issuer would be taking significant write-offs in the near future and that "d[id] not differ qualitatively" from the announcement that plaintiffs admitted had placed them on notice of their claims. *Id.* at 222.

### 3. *Relation Back for Additional Underwriter Defendants*

The Underwriter Defendants also move to dismiss the claims against the Additional Underwriter Defendants as time-barred because the Additional Underwriter Defendants were not added to the action until the Alaska Plaintiffs filed an amended complaint on September 24, 2003. Plaintiffs do not respond directly to this argument.

■ Rule 15 of the Federal Rules of Civil Procedure provides that an amended pleading relates back to the date of the original timely pleading when:

> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within [120 days] the party to be brought in by amendment (A) has received such notice of this institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a *mistake concerning the identity* of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c)(emphasis supplied). Thus, there are three requirements to be met before an amended complaint naming a new party can be found to relate back to a timely complaint: (1) both complaints must arise out of the same conduct, transaction or occurrence, (2) the additional defendant must have been omitted from the original complaint by mistake; and (3) the additional defendant must not be prejudiced by the delay. *VKK Corp. v. National Football League*, 244 F.3d 114, 128 (2d Cir.2001); *Soto v. Brooklyn Correctional*

*Facility,* 80 F.3d 34, 35 (2d Cir.1996). The relation-back principles are designed "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." *VKK Corp.,* 244 F.3d at 128 (citation omitted).

■ A "mistake" for purposes of Rule 15 may be a mistake of either fact or law. *See Soto,* 80 F.3d at 35–36. A mistake of fact occurs when a plaintiff misapprehends the identities of the individuals she wishes to sue. *Id.* "The requirement that a new defendant 'knew' he was not named due to a mistake concerning identity presupposes that in fact the reason for his not being named was a mistake in identity." *Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994). A mistake of law occurs when she misunderstands the legal requirements of her cause of action. *Soto,* 80 F.3d at 36. Where a plaintiff shows neither type of mistake, the amended pleading will not relate back. In *Cornwell,* the plaintiff had always known the identities of the defendants who were added in the amended complaint, and their absence from the original complaint did not make that complaint legally deficient. *Id.* at 705. The Second Circuit explained that "Cornwell was not required to sue [the individual defendants], and her failure to do so in the original complaint . . . must be considered a matter of choice, not mistake." *Id.*

■ Like *Cornwell,* the Alaska Plaintiffs knew the identities of the Additional Underwriter Defendants, were not required to name them to make their original complaint legally sufficient, and chose not to name them. The Additional Underwriter Defendants were identified by name in the Offering documents giving rise to the claims alleged in the Initial Complaint,

and the Additional Underwriter Defendants had been named in other, earlier complaints asserting similar claims. Since the plaintiffs knew of the proposed defendants and chose not to name them, they are assumed to have omitted the defendants intentionally, not by mistake. *See Cornwell,* 23 F.3d at 705; *Corcoran v. New York Power Auth.,* 935 F.Supp. 376, 393 (S.D.N.Y.1996) (DLC).

Since plaintiffs have failed to demonstrate that the omission was a mistake, the claims against the Additional Underwriter Defendants in the Complaint do not relate back to the date of the Initial Complaint. Under Rule 15, the addition of a defendant is nonetheless permitted if the amended pleading is within the statute of limitations applicable to the action. *See* Fed.R.Civ.P. 15(c)(1).

The Alaska Plaintiffs' Complaint has been deemed filed on September 24, 2003, approximately one year and three months after WorldCom's June 25 restatement announcement. Plaintiffs allege in the Complaint that "by 6/25/02, WorldCom admitted it had engaged in one of the largest financial falsifications in history." Plaintiffs also allege that in June 2002, WorldCom filed a report with the SEC admitting that its accounting since 1999 was flawed, the SEC sued WorldCom for fraud, and that by August 2002 WorldCom's Chief Financial Officer had been indicted on criminal fraud charges.

■ There can be no doubt that at least as of WorldCom's announcement on June 25, 2002—that it would have to restate its publicly reported financial results for 2001 and the first quarter of 2002 by $3.8 billion—plaintiffs were on inquiry notice of their Sections 11 and 12(a)(2) claims.[23] Because the Alaska Plaintiffs' September 24, 2003 Complaint was filed

---

**23.** Amici contend that the plaintiffs were not on inquiry notice that WorldCom's financial statements for the period before 2001 were "teeming with fraud" until November 26, 2002, when the SEC filed an amended complaint against WorldCom with claims based on violations of the Securities Act. Similarly, they argue that the press reports before June 2002 did not give notice that the underwriters

more than a year after they had been put on notice of their claims, Section 13's statute of limitations requires that the defendants' motion to dismiss the claims against the Additional Underwriter Defendants be granted, unless the statute of limitations period was tolled.[24]

### 4. American Pipe Tolling for Actions filed before Class Certification

■ The Alaska Plaintiffs and Amici rely on the *American Pipe* tolling doctrine to extend Section 13's statute of limitations period.[25] The doctrine provides that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Construc. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The Court explained that

A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable.

*Id.* at 553, 94 S.Ct. 756. The Court observed that under Rule 23, class actions are "designed to avoid, rather than encourage" repetitious filing. *Id.* at 550, 94 S.Ct. 756. *American Pipe* found equitable tolling appropriate precisely because it did not want to punish putative class members who had waited to file an action, as encouraged by Rule 23, and had relied, knowingly or not, on the class litigation only to find that the class was not certified and their time to file independent actions had expired. *See* 414 U.S. at 551, 94 S.Ct. 756.

Although *American Pipe* itself tolled the statute of limitations only for those who moved to intervene after class certification had been denied, the Supreme Court later extended the doctrine to apply to class members who choose to file separate suits after class certification is denied. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). In *Crown, Cork,* the Court held that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id.* at 354, 103 S.Ct. 2392. In *Crown, Cork,* the Supreme Court emphasized that without the tolling rule

---

for the Offerings had participated in the fraud. The Securities Act claims, as already described, do not sound in fraud and create extensive liability for the underwriters. Therefore, the statute of limitations for Securities Act claims begins to run from the date that an investor was on notice that the registration statement or prospectus for the offering probably contained misrepresentations actionable under the Securities Act.

**24.** For the same reasons, the motions by the Individual Defendants, all of whom were added to the Alaska Action in the Complaint, must also be granted unless the statute of limitations period was tolled. The Individual Defendants are WorldCom executives, officers

and directors who have been identified by name in numerous WorldCom documents and named as defendants in many earlier complaints asserting similar claims, including in the complaint filed in October 2002 in the Consolidated Class Action. As with the Additional Underwriter Defendants, the Alaska Plaintiffs are assumed to have omitted the Individual Defendants by intention, not mistake.

**25.** *American Pipe* tolling could not save the claims relating to either the 1998 or December 2000 Offerings since the Consolidated Class Action complaint does not assert claims based on either offering.

"[a] putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations," which would result in "a needless multiplicity of actions." *Id.* at 350–51, 103 S.Ct. 2392; *see also Arneil v. Ramsey,* 550 F.2d 774, 783 (2d Cir.1977).

Although both *American Pipe* and *Crown, Cork* address only actions brought by putative class members *after* class certification was denied, the Alaska Plaintiffs and Amici urge that the *American Pipe* doctrine applies as well to plaintiffs who filed individual actions *before* a class is certified. Although the Second Circuit has not yet decided this issue, district courts in this circuit have held that a plaintiff who chooses to file an action independently of the class before a determination on class certification cannot benefit from the *American Pipe* tolling rule. *See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 261 F.Supp.2d 188, 221 (E.D.N.Y. 2003); *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 514 (S.D.N.Y. 2001); *Wahad v. City of New York,* No. 75 Civ. 6203(AKH), 1999 WL 608772, at *6 (S.D.N.Y. Aug.12, 1999); *see also Chinn v. Giant Food, Inc.,* 100 F.Supp.2d 331, 335 (D.Md.2000); *Rahr v. Grant Thornton LLP,* 142 F.Supp.2d 793, 800 (N.D.Tex. 2000); *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94 C 897, MDL 997, 1998 WL 474146, at *8 (N.D.Ill. Aug.6, 1998); *Stutz v. Minn. Mining & Mfg. Co.,* 947 F.Supp. 399, 404 (S.D.Ind. 1996); *Chemco, Inc. v. Stone, McGuire &*

*Benjamin,* 1992 WL 188417, at *2 (N.D.Ill. July 29, 1992); *Wachovia Bank and Trust Co. v. National Student Marketing Corp.,* 461 F.Supp. 999, 1012 (D.D.C.1978). As explained in these decisions, the plaintiffs who choose to file an independent action without waiting to consider the determination of class certification are not entitled to enjoy the benefits of the tolling rule. Applying the tolling doctrine to separate actions filed prior to class certification would create the very inefficiency that *American Pipe* sought to prevent.

The cases on which plaintiffs rely are not to the contrary. None of the decisions upon which Amici rely addresses whether the tolling doctrine applies to individual actions commenced *before* a decision on class certification. Instead, each applies the *American Pipe* tolling doctrine to actions filed by class members who opted out of the class and thereafter filed independent actions. *See Realmonte v. Reeves,* 169 F.3d 1280, 1283 (10th Cir.1999); *Adams Pub. Sch. Dist. v. Asbestos Corp.,* 7 F.3d 717, 718 (8th Cir.1993); *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1487 (9th Cir.1985).[26]

The only case on which Alaska Plaintiffs rely, *McKowan Lowe & Co. v. Jasmine Ltd.,* 295 F.3d 380 (3d Cir.2002), is also inapposite. There, the district court had denied a motion to certify a class based on a determination that the named plaintiff's claims were not typical and that he would not provide adequate representation for the class. *Id.* at 383 Shortly thereafter, a new party moved to intervene.[27] *Id.* Ap-

---

**26.** One case on which Amici rely, *Edwards v. Boeing Vertol Co.,* 717 F.2d 761 (3d Cir.1983), *vacated on other grounds,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), involved claims of employment discrimination. The Third Circuit required each individual class member to intervene and present evidence of having satisfied the jurisdictional prerequisites for such claims in order to be entitled to relief through the class action vehicle. *Id.* at

765. The plaintiff filed his individual action over two years after the class action had been filed. *Id.* at 762. The Third Circuit held that the plaintiff was entitled to rely on the class action so long as it was pending. It observed that any other rule "would needlessly proliferate separate lawsuits." *Id.* at 766.

**27.** Amici contend that the *McKowan* court addressed whether *American Pipe* tolling would benefit a class member intervening

plying *American Pipe* tolling, the district court held that his individual claims were timely, but ruled that the class claim he sought to bring was barred by the statute of limitations. *Id.* The Third Circuit held "that the class claims of intervening class members are tolled if a district court declines to certify a class for reasons unrelated to the appropriateness of the substantive claims for certification." *Id.* at 389.

Neither the Alaska Plaintiffs nor Amici have explained how applying the *American Pipe* tolling doctrine to individual actions filed prior to a determination on class certification would advance any of the goals identified by *American Pipe* and its progeny. Instead, the Alaska Plaintiffs argue that without access to the *American Pipe* tolling doctrine, institutions intending to file their own suits will simply forbear doing so until it is time to opt out of the class. They ask rhetorically what good purpose will be served by such a delay?

Many good purposes are served by such forbearance, as *American Pipe* and *Crown, Cork* themselves spell out. The parties and courts will not be burdened by

separate lawsuits which, in any event, may evaporate once a class has been certified. At the point in a litigation when a decision on class certification is made, investors usually are in a far better position to evaluate whether they wish to proceed with their own lawsuit, or to join a class, if one has been certified. This very motion illustrates the wisdom of waiting. Investors who wait can take the measure of class counsel and the course of the litigation as it unfolds and can then make an informed decision as to whether their interests are best served by remaining in the action or by opting out.[28]

Amici argue that without *American Pipe* tolling there will be a "bizarre gap" from the filing of a class action until a decision on certification, and an "onslaught of individual actions" by plaintiffs who wish to preserve their right to pursue individual actions.[29] Quite the opposite is true. Because *American Pipe* tolling applies to all putative class members, no individual action, much less an onslaught of individual actions, need be filed prior to a certification decision in order to preserve the right to bring such an action. After a

"before" class certification had been ruled upon, quoting the following language: "[W]e see no good reason why class claims should not be tolled where the district court had not yet reached the issue of the validity of the class. [The defendant] has not supplied any persuasive reason for making such a distinction." *McKowan*, 295 F.3d at 389. In fact, the plaintiff in *McKowan* intervened after the district court rejected the motion to certify, and the Circuit Court found that post-decision intervention protected by *American Pipe* tolling.

28. Litigation over Milberg Weiss' written solicitation efforts has revealed that it has urged pension funds to retain Milberg Weiss and file independent actions by inducing confusion and misunderstanding regarding the benefits of an individual action and by derogating the class action option. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22701241, at *6–7 (S.D.N.Y. Nov.17, 2003).

As a consequence, a curative notice will be provided to all plaintiffs who have filed Individual Actions. *See id.* at *9.

29. Amici argue that individual plaintiffs will be forced to choose at an early point in the litigation whether to file an individual action or be precluded from doing so until a decision on class certification, which could require a wait of "several years." To the contrary, the Federal Rules of Civil Procedure require that certification of a class should be determined "as soon as practicable" after an action has been commenced, Fed.R.Civ.P. 23(c)(1), so that the defendants may "be told promptly the number of parties to whom [they] may ultimately be liable for money damages." *Siskind v. The Sperry Retirement Prog.*, 47 F.3d 498, 503 (2d Cir.1995) (citation omitted). In this case, the class was certified on October 24, 2003, twelve weeks after the filing of the Consolidated Amended Complaint in the class action.

decision on certification is rendered, a plaintiff may file an individual action. If a class has been certified, the plaintiff will opt out of the class and file an individual action.[30]

Limiting the *American Pipe* tolling doctrine to plaintiffs who wait until after a decision on class certification to commence their actions is consistent with the purpose and holdings of both *American Pipe* and *Crown, Cork.* Those decisions were driven by concerns regarding the fate of class members in cases that were not allowed to proceed as class actions. The tolling rule provides that when the class certification decision is made, those who relied knowingly or not on the class action to pursue their claims will not be penalized for their forbearance. The same logic does not warrant extending the tolling period to individual actions filed *before* a determination on class certification. Plaintiffs who choose, as is their right, to pursue separate litigation may not enjoy the benefits of that separate litigation without bearing its burdens. One of the burdens plaintiffs bear is the obligation to commence their actions within the applicable statute of limitations.

Having chosen to pursue an individual action prior to a decision on class certification, the Alaska Plaintiffs are not protected by the *American Pipe* tolling doctrine. Since they failed to amend their pleading within the period provided by Section 13, the Alaska Plaintiffs' claims against the Additional Underwriter Defendants and the Individual Defendants are time-barred and dismissed with prejudice.[31]

*5. Section 12(a)(2) Liability for December 2000 Offering*

The Underwriter Defendants move to dismiss the Section 12(a)(2) claim against J.P. Morgan arising from the December 2000 Offering. They contend that the December 2000 sale of bonds was not a public offering but a private placement, and therefore, not covered by Section 12(a)(2).

It is undisputed that Section 12(a)(2) does not provide a cause of action for private placements. The "primary innovation" of the Securities Act was the creation of duties "in connection with public offerings." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). While the liability imposed by Section 11 flows from the requirements for the filing of registration statements, the liability imposed by Section 12(a)(2) flows from the requirements to distribute prospectuses. *Id.* In *Gustafson,* the Supreme Court held that Section 12(a)(2) did not create a cause of action for written misrepresentations contained other than those contained in a prospectus. *Id.* at 584, 115 S.Ct. 1061. The Court explained that the term "prospectus" in Section 12(a)(2) is confined to a document that "must include the information contained in the registration statements." *Id.* at 569, 115 S.Ct. 1061 (citation omitted). It is "a document soliciting the public to acquire securities." *Id.* at 574, 115 S.Ct. 1061. *See also id.* at 581, 584, 115 S.Ct. 1061. The Court explicitly rejected the proposition that Section 12(a)(2) covers any communication of-

---

**30.** It would appear that the filing of an individual action after certification is, *de facto,* notice of an intent to opt out of the class. The parties have not addressed that issue, however.

**31.** Amici argue that "at most" the statute of limitations clock should begin to run again with whatever time remained unelapsed when the class action was filed. They do not explain how this would work or what they mean. The Alaska Plaintiffs remark in passing that a time barred suit can be refiled after class certification is denied. They cite no authority that would support the refiling of litigation that has been dismissed as time-barred. Any such dismissal is with prejudice.

fering a security for sale. *Id.* at 574, 115 S.Ct. 1061.

Private placements or sales of securities are permitted by the securities laws. The general registration requirement in the Securities Act, Section 5, provides that it is unlawful to sell or offer for sale a security unless a registration statement has been filed as to that security. 15 U.S.C. § 77e. Sections 3 and 4 of the Securities Act create exceptions to the registration requirements. *See* 15 U.S.C. §§ 77c & 77d. Of the exceptions in Sections 3 and 4, the one that is relevant to the WorldCom bonds sold in December 2000 is Section 4(2)'s exception for "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2).[32] Such private offerings are permitted to be made to, among others, investors such as the qualified institutional investors at issue here.[33]

▮ The fact that the December 2000 Offering was a private placement is clear from its face. The Offering Memorandum states that it "is personal to each person to whom it has been delivered and does not constitute an offer to any other person or to the public generally." [34] It prohibits offerees from photocopying or disseminating the document. On its first page and in a section captioned "transfer restrictions," it explains that the Notes "have not been registered under the Securities Act and

may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, in a transaction not subject to or in a transaction in compliance with the registration requirement of the Securities Act." Each Note was required to bear a legend stating that the security "has not been registered under the Securities Act ... and may not be offered, sold, pledged or otherwise transferred" except in accordance with certain limitations, including the limitation that the acquirer be a "qualified institutional buyer" as defined by Rule 144A or "not a U.S. person" as defined by SEC Regulation S.

The first page of the Offering Memorandum explains that the notes are being offered only "to qualified institution buyers (as defined in rule 144A under the Securities Act) in compliance with Rule 144A, and [] to non-U.S. persons outside the United States in reliance on Regulation S." The Offering Memorandum warns qualified institutional buyers that the seller "may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A." Rule 144A exempts private placements from the registration requirements of Section 5. *See* 15 U.S.C. 77(d)(2); 17 C.F.R. § 230.144A.

The Complaint offers only limited allegations regarding the December 2000

---

**32.** Plaintiffs admit that the December 2000 bonds were exempt from the SEC registration requirements, and have not identified any exception other than that for private placements that would have allowed the defendants to conduct a bond offering without filing a registration statement. While they point out that an offering to foreign investors pursuant to Regulation S need not be registered, they do not contend that that is the exemption at issue here. Nor could they. The Alaska Plaintiffs are clearly not foreign investors.

**33.** The Alaska Plaintiffs admit that they were qualified institutional investors, as defined by the securities regulations. SEC Rule 144A

governs "private resales of securities to institutions" and defines the "qualified institutional buyer[s]" authorized to purchase in a private placement. *See* 17 C.F.R. § 230.144A(7)(a).

**34.** On a motion to dismiss, the Court may consider documents the plaintiffs possessed or knew about and upon which they relied in bringing suit. *Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001); *Rothman,* 220 F.3d at 88. Plaintiffs are presumed to have relied upon the December 2000 Offering Memorandum, and have submitted it as an exhibit in support of their opposition to the motion to dismiss.

transaction, but its limited allegations confirm that the transaction was a private placement. The Complaint alleges that in December 2000 "WorldCom and J.P. Morgan" raised "$2 billion from [a] bond private placement." [35] It also alleges that the December 2000 transaction was exempt from SEC registration requirements. It consistently describes the document disseminated in connection with the December 2000 transaction as an "offering memorandum," not as a prospectus.[36]

Although the Complaint describes the December 2000 Offering as a "private placement," the plaintiffs remarkably contend in their opposition to this motion, that the December 2000 Offering was *not* a private placement, but a public offering. They propose to circumvent both the clear language of the Offering Memorandum and their Complaint by simply amending the Complaint. They now seek to allege through a proposed three-page addition to their pleading that the December 2000 transaction was a public offering because (1) the Offering Memorandum was a mass-produced document which incorporated WorldCom SEC filings and contained a clause that indemnified JP Morgan for claims that it had violated the Securities Act; (2) JP Morgan functioned as an underwriter in the same manner as it would in a firm commitment public offering of securities; (3) JP Morgan created a public trading market for the December 2000 bonds after their initial distribution and sale; and (4) the bonds were offered to hundreds of "qualified institutional investors" and were sold to over 200 such buyers in the initial public offering. The proposed amendments also allege for the first time that the "prospectus" for the December 2000 Offering contained "the type of information" contained in a prospectus in a registered public offering.[37]

The explicit restrictions of the Offering Memorandum indicate that it was not issued in connection with a public offering and is instead a private placement. As noted, it refers specifically to the exemption from registration for private placements. Although the Second Circuit has not addressed this issue, other courts in this Circuit have found that offerings made *via* private placement memoranda similar to that at issue here are not public offerings. *See In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239, 1259 (S.D.N.Y.1996) (summary judgment); *Glamorgan Coal Corp. v. Ratner's Group PLC*, No. 93 Civ. 7581(RO), 1995 WL 406167, at *2–3 (S.D.N.Y.1995) (motion to dismiss).

The terms of the Offering Memorandum compel the conclusion that the December

**35.** Inserted into the body of the Complaint following page ten, and incorporated into the text of paragraph sixteen, is a multi-colored and annotated graph reflecting WorldCom's daily stock and bond prices for four years. The graph bears a color picture of Bernard J. Ebbers, the stock and bond prices, each in their own separate color, and annotations in red or black explaining both the accounting abuses and key events, such as the following entry for December 2000. "WorldCom and JP Morgan raise $2 billion from bond private placement. Used proceeds to pay down commercial paper debt. Does not borrow from banks." The graph bears a copyright notice that reads, "copyright (c) by William S. Lerach and Milberg Weiss [ ]. William S. Lerach and Milberg Weiss [ ] will vigorously defend all of their rights to this writing/publication." This copyright notice is in addition to that given below the Complaint's caption for the contents of the entire pleading.

**36.** By comparison, the Complaint consistently describes the documents disseminated in connection with the three other Offerings as prospectuses.

**37.** The proposed amendment does not include any deletion of the Complaint's allegations that the December 2000 Offering was exempt from registration or that the December Offering was a private placement.

2000 Offering was a private placement, and allegations in the proposed amendments to the Complaint which contradict the Offering Memorandum (as well as the Complaint) are ineffective to convert it into a public offering subject to Section 12(a)(2). As the *Glamorgan* court found when it was confronted with a similar effort at amendment to escape dismissal, "no matter how the plaintiff might word the claim, the document involved cannot be silkenized into a § 12(a)(2) 'prospectus.'" *Id.* (citation omitted).

The Alaska Plaintiffs argue that leave to amend must be freely given, and once their pleading is amended, this motion to dismiss must be denied since the pleading raises questions of fact that are not suitable to resolution on a motion to dismiss, particularly because the defendants' assertion that the offering was a private placement is an affirmative defense on which the defendants bear the burden. The Alaska Plaintiffs admit that the December 2000 Offering "was structured to be exempt from registration because those bonds were to be initially offered to *only* qualified institutional investors," but contend that the transaction nonetheless became a public offering. (Emphasis in original.) They argue that the determination of whether a transaction was a private placement or public offering requires the application of a multi-factor test. None of the cases on which they rely, however, applies such a test to circumstances remotely similar to those here.

This application to amend must be denied. The Alaska Plaintiffs admit that they can bring no Section 11 claim based on the December 2000 Offering because it was exempt from the registration requirements of the securities laws. They have not identified how the December 2000 Offering was exempt from registration requirements other than as a private placement. Given the contents of the December 2000 Offering Memorandum, the admissions in the Complaint that the December 2000 Offering was a private placement, and the absence of any explanation of how the December 2000 Offering is both exempt from registration and yet properly considered a public offering, it would be wrong to allow the amendment that the Alaska Plaintiffs have proposed.

### Conclusion

The Underwriter Defendants' motion to dismiss is granted in part and denied in part. The motion to dismiss the Section 11 claims based on the May 2000 and May 2001 Offerings is denied. The motion to dismiss is granted with respect to the following claims, each of which is dismissed with prejudice: (1) the Section 11 claim based on the 1998 Offering, (2) all Section 11 claims against the Additional Underwriter Defendants, and (3) the Section 12(a)(2) claim based on the December 2000 private placement.

The motions to dismiss by the Director Defendants and by Ebbers are granted with prejudice.

SO ORDERED.